Charles A. CASTLE, Plaintiff,

v.

SANGAMO WESTON, INC., Defendant.

Chris PAPASTRAT, et al., Plaintiffs,

v.

SANGAMO WESTON, INC., Defendant.

Civ. A. Nos. 81–421–Civ–T–GC, 81–529–Civ–T–GC.

United States District Court, M.D. Florida, Tampa Division.

July 17, 1986.

George Barford, John P. McAdams, Carlton, Fields, Ward Emmanuel, Smith & Sutler, P.A., Tampa, Fla., James E. Aker, Icard, Merrill, Cullis, Timm & Furen, P.A., Sarasota, Fla., for plaintiffs.

Lorraine Anaya, E.E.O.C., Miami, Fla., for E.E.O.C.

Warren M. Goodrich & Mary Applegate, Holland & Knight, Bradenton, Fla., Eugene T. D'Ablemont, Ned H. Bassen, Kelley Drye & Warren, New York City, Ben H. Hill, III, Mark A. Hanley, Shackleford, Farrior, Stalling & Evans, P.A., Tampa, Fla., for defendant.

## MEMORANDUM OPINION

RICHARD E. ROBINSON, Senior District Judge.[*]

### I. BACKGROUND.

These actions were brought under the Age Discrimination in Employment Act (ADEA or Act), 29 U.S.C. Section 621 *et seq.*, and were tried to the Court and a jury over the course of a five week period. On March 5, 1986, the jury returned its verdicts via special interrogatories in favor of each of the ten individual plaintiffs on the issue of liability, finding that the plaintiffs had been discriminated against based upon their age, that the defendant's violation of the ADEA was willful, and awarding nine of the ten plaintiffs back pay.

Defendant made a timely motion for directed verdict at the end of all the evidence on which the Court reserved ruling. On March 6, 1986, the Court heard arguments on this motion. At the beginning of this hearing the defendant made an oral motion for judgment notwithstanding the verdict, pursuant to Fed.R.Civ.P. 50(b). At the Court's request, the parties' arguments covered all issues raised by the motion for directed verdict, as well as, all issues raised by defendant's motion for judgment notwithstanding the verdict. This was done to accommodate the judge who presided over the trial and avoid a return trip from Omaha, Nebraska, to Tampa, Florida, to hear

[*] Of the District of Nebraska.

argument on a motion for judgment notwithstanding the verdict. Of course, the standard governing the resolution of such motions is the same. *Boeing Company v. Shipman,* 411 F.2d 365 (5th Cir.1969) (en banc).

After the jury was discharged and the parties were heard on their post-trial motions, the Court heard additional evidence on the equitable issues of reinstatement, front pay damages, and liquidated damages. The parties were instructed to submit post-trial briefs addressing the motions for directed verdict and judgment notwithstanding the verdict, as well as, the remaining equitable issues to be decided by the Court. These briefs were timely received and the actions are deemed submitted for final determinations.

## II. DISCUSSION.

A. Entry of judgments on back pay and liquidated damages:

The Court finds, and will enter judgments accordingly, that based upon the jury's answers to the questions contained in the verdict forms judgments should be entered against the defendant Sangamo Weston and in favor of the plaintiffs for back pay damages as follows:

1. Shelby D. Bass, Jr. is entitled to recover from the defendant the sum of $181,541.00;

2. Gerard E. Breyton is entitled to recover from the defendant the sum of $17,094.00;

3. Charles A. Castle shall recover nothing from the defendant (as to back pay);

4. Edward G. Fearn is entitled to recover from the defendant the sum of $138,476.00;

5. James W. Gregory is entitled to recover from the defendant the sum of $137,768.00;

6. Harry K. Moore is entitled to recover from the defendant the sum of $34,972.00;

7. John S. Norton is entitled to recover from the defendant the sum of $74,061.00;

8. Chris Papastrat is entitled to recover from the defendant the sum of $22,375.00;

9. Richard Ridgewell is entitled to recover from the defendant the sum of $164,259.00; and

10. Donald J. Woodworth is entitled to recover from the defendant the sum of $879.00.

If the jury's verdict is allowed to stand as to liability, back pay damages, and the finding that the defendant's actions were willful, then the Court must consider whether liquidated damages should be awarded. The jury having found that the defendant's alleged violations of the ADEA were willful as to each plaintiff, the Court finds that liquidated damages, in an amount equal to the jury's back pay award, should be awarded to each prevailing plaintiff.[1]

---

**1.** There is a question as to whether a trial court in an ADEA case has any discretion to reduce or deny an award of liquidated damages upon a showing of good faith by the employer, after the jury has found the employer's actions were willful. *See Schlei & Grossman, Employment Discrimination Law,* 1983–84 cum. supp. 99 (2d ed. 1985) (citing cases). Defendant contends that the Court can and should consider its "good faith" in determining the amount, if any, of liquidated damages to which plaintiffs might be entitled. Plaintiffs contend that the "good faith" argument advanced by the defendant is no longer viable in light of the Supreme Court's decision in *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985) (hereinafter TWA). The Eleventh Circuit has not addressed this issue, however, the district court in *Spanier v. Morrison's Management*

*Services,* 611 F.Supp. 642 (N.D.Ala.1985), granted defendant's motion for j.n.o.v. on plaintiff's liquidated damages claim and commented on the confusion surrounding this issue. *Id.* at 646–47.

This Court agrees with the reasoning in *Spanier* and would deny liquidated damages altogether, were it not for the interpretations made by several courts which indicate liquidated damages are mandatory upon a finding of willfulness. *See Powell v. Rockwell International Corp.,* 788 F.2d 279, 287–89 (5th Cir.1986); *Babb v. Sun Co., Inc.* 562 F.Supp. 491, 494 (D.Minn. 1983) (citing cases); *Jacobson v. Pitman-Moore, Inc.,* 34 Fair Empl.Prac.Cases 1082 (D.Minn. 1984) [Available on WESTLAW, DCTU database]; *Cowen v. Standard Brands, Inc.,* 572 F.Supp. 1576, 1580–81 (N.D.Ala.1983). *But,*

The Court will enter judgments against the defendant and in favor of the plaintiffs for liquidated damages as follows:

1. Shelby D. Bass, Jr. is entitled to recover from the defendant the sum of $181,541.00;

2. Gerard E. Breyton is entitled to recover from the defendant the sum of $17,094.00;

3. Charles A. Castle shall recover nothing from the defendant (as to liquidated damages);

4. Edward G. Fearn is entitled to recover from the defendant the sum of $138,476.00;

5. James W. Gregory is entitled to recover from the defendant the sum of $137,768.00;

6. Harry K. Moore is entitled to recover from the defendant the sum of $34,972.00;

7. John S. Norton is entitled to recover from the defendant the sum of $74,061.00;

8. Chris Papastrat is entitled to recover from the defendant the sum of $22,375.00;

9. Richard Ridgewell is entitled to recover from the defendant the sum of $164,259.00; and

10. Donald J. Woodworth is entitled to recover from the defendant the sum of $879.00.

B. Equitable issues—front pay and reinstatement:

■ Turning to front pay damages, the Court has carefully considered the parties' arguments, their briefs in support of their respective positions on the numerous issues involved therein, and the relevant case law. Front pay is clearly an available remedy in an ADEA case in the Eleventh Circuit, but the preferred remedy is reinstatement and before front pay damages can be considered, the Court must determine if any of the prevailing plaintiffs are entitled to reinstatement. *Goldstein v. Manhatten Industries, Inc.,* 758 F.2d 1435, 1448–49 (11th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 525, 88 L.Ed.2d 457 (1986) ("[The Eleventh Circuit] has expressly held that an award of front pay—i.e. prospective lost earnings—may be an appropriate remedy in an age discrimination suit because reinstatement would be impracticable or inadequate."), citing, *O'Donnell v. Georgia Osteopathic Hospital, Inc.,* 748 F.2d 1543, 1551–52 (11th Cir.1984) (front pay may be awarded in lieu of reinstatement "only after reinstatement is dismissed as a realistic alternative."). "The determination of whether reinstatement is an appropriate remedy lies within the sound discretion of the district court. More generally, the selection of remedies for an ADEA violation is a matter of the trial court's discretion, so long as the relief granted is consistent with the purposes of the Act." *Goldstein,* 758 F.2d at 1448.

Although the plaintiffs indicated throughout the trial that they were seeking reinstatement into their former positions and the defendant's pension plan, they were quick to point out that "exceptional circumstances" exist which would necessitate them being awarded front pay and

*compare Hill v. Spiegel, Inc.,* 708 F.2d 233, 238 (6th Cir.1983) and *Rose v. National Cash Register Corp.,* 703 F.2d 225, 230 (6th Cir.1983) *cert. denied,* 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 317 (1983), *with Whitfield v. City of Knoxville,* 756 F.2d 455, 463 (6th Cir.1985) (the Supreme Court ruling in *TWA* "as to the good faith defense effectively overrules so much of this court's decision in *Rose v. National Cash Register Corp.,* [*supra*], as held that an employer's protestations of good faith are irrelevant."). However, several courts have indicated that the district court has some discretion in awarding liquidated damages, despite a finding of willfulness. *See, Spanier, supra; Wilhelm v. Blue Bell,* *Inc.,* 773 F.2d 1429, 1435 (4th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1199, 89 L.Ed.2d 313 (1986); *E.E.O.C. v. Prudential Federal Savings and Loan Association,* 763 F.2d 1166, 1173–75 (10th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 312, 88 L.Ed.2d 289 (1985); *E.E.O.C. v. Wyoming Retirement System,* 771 F.2d 1425, 1431 (10th Cir.1985); *Armsey v. Nestle Co., Inc.,* 631 F.Supp. 717, 722–24 (S.D.Ohio 1985). Nevertheless, if the jury's finding as to liability, willfulness, and damages are upheld, this Court would award plaintiffs liquidated damages in amounts equal to the jury's back pay award.

pension benefits in lieu of reinstatement.[2] Plaintiff's position regarding reinstatement has been clarified to some extent and it now appears that they are arguing more in favor of front pay damages and against reinstatement. In their post-trial brief plaintiffs state:

> In the case at bar, reinstatement of the plaintiffs into their former jobs is not practicable. The evidence in the record mandates this conclusion. In view of the defendant's stated intention to appeal any judgment against it to the Eleventh Circuit, the implementation of any reinstatement order would be at least two years away, or almost a decade since the plaintiffs were fired. In addition to the significant passage of time, there are a number of other judicially recognized factors which militate against reinstatement. There is a serious question whether comparable positions are available; defendant says there are no such positions. Undeniably, this litigation has engendered considerable animosity and antagonism between the parties. In addition, the evidence clearly indicates that technology in the telemetry industry has changed dramatically in the years following the plaintiffs' termination.

(Plaintiffs' post-trial brief at 37 [footnote omitted]).

■ Even if the jury's verdicts on liability were to stand, thus bringing up the question of reinstatement or front pay, this Court essentially agrees with plaintiffs' argument that reinstatement for all of the plaintiffs would be inappropriate. Therefore, the Court finds that due to the passage of time since the plaintiffs' termi-

nations, the restructuring of Sangamo Weston's departments in which the plaintiffs worked, the elimination of jobs held by the plaintiffs, the changing technology in the industry, and various other factors, reinstatement is inappropriate for all plaintiffs. This finding raises the next issue of whether an award of front pay is appropriate and, if so, the amount of such an award.

■ An award of front pay is an equitable remedy which is guided by the district court's "sound discretion." *Goldstein,* 758 F.2d at 1148. This discretion must be tempered by the underlying proposition that the intent of the ADEA is to make a wrongfully discharged or demoted plaintiff "whole," or in other words to put the plaintiff in the same position he, she would have been in absent any discriminatory actions. *Gibson v. Mohawk Rubber Co.,* 695 F.2d 1093, 1097 (8th Cir.1983); *Whittlesey v. Union Carbide Corp.,* 742 F.2d 724, 727–28 (2d Cir.1984); *Geller v. Markham,* 635 F.2d 1027, 1036 (2d Cir. 1980), *cert. denied,* 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981). No precise guidelines have been established by the Eleventh Circuit (or any other circuits of which the Court is aware) which would assist this Court in determining whether an award of front pay should be made and the amount of such equitable relief if granted. As the court in *Davis v. Combustion Engineering, Inc.,* 742 F.2d 916, 922–23 (6th Cir.1984), put it, " 'Front pay' does not lend itself to a per se rule. It is neither mandatory nor prohibited by the Act. Rather, it

---

**2.** Plaintiffs hedged their position early on when they stated:

> While all plaintiffs in the case at bar seek reinstatement and none wish to waive their right to it, for one or more of these reasons, and because of the many years that have passed since plaintiffs' terminations, this Court may determine that reinstatement is improper for some or all plaintiffs. Indeed, during the nearly seven years that have passed since plaintiffs' terminations, technology has changed significantly and several plaintiffs have been unable to maintain their skill and familiarity with this changing tech-

nology. The plaintiffs' jobs, if they still exist at all, have been filled for nearly seven years by other employees who are otherwise innocent of any of the discriminatory acts of defendant. Additionally, several plaintiffs are within a few years of retirement. In light of some or all of these other factors, reinstatement may not be practical for one or more plaintiffs. If the Court finds reinstatement inappropriate for any of these reasons, it should provide each plaintiff not reinstated with prospective relief.
> Plaintiffs' Trial Brief at 70.

is but one of a broad range of remedial measures available under the ADEA."

A general rule on front pay was established by the First Circuit in *Wildman v. Lerner Stores Corp.*, 771 F.2d 605 (1st Cir.1985), which this Court would note sets forth factors which should be considered in determining whether to make an award of front pay. The court in *Wildman* surveyed the holdings of a number of other circuits confronting the front pay issue, *id.* at 615–16, and noted that "in discussing front pay under the ADEA all courts have stressed the broad remedial power given [to them] under 29 U.S.C. Section 626(b)...." *Id.* at 616. It then set forth the following rule on front pay:

> Future damages should not be awarded unless reinstatement is impracticable or impossible; the district court then, has discretion to award front pay. Because future damages are often speculative, the district court, in exercising its discretion, should consider the circumstances of the case, including the availability of liquidated damages.

*Id.* The appeals court affirmed the district court's denial of front pay in light of the fact that plaintiff received compensatory damages, liquidated damages, and other specific damages, for over $348,000 in total damages. Thus, this Court must use its discretion to determine whether plaintiffs are entitled to an award of front pay under the ADEA. *Goldstein,* 758 F.2d at 1448; *Wildman,* 771 F.2d at 616; *Davis,* 742 F.2d at 923. Such a determination necessarily includes an evaluation of all the circumstances of this case, as well as what it will take to make the plaintiffs whole.

■ The Court has considered the three alternative figures for front pay proposed by the plaintiffs, the alternative figures proposed by the defendant, the arguments and cases in support of the respective calculations, and the damages that have been heretofore awarded to the plaintiffs. *See* Appendix, Figure 1. If the jury's verdicts are allowed to stand as to liability and back pay damages, and the awards for liquidated damages also stand, then this Court would find that the plaintiffs Fearn, Gregory, and Ridgewell should be awarded front pay damages in the amounts suggested by the defendant in order to make them whole. This would mean that judgments would be entered against the defendant and in favor of the following plaintiffs for front pay damages:

1. Edward G. Fearn is entitled to recover from the defendant the sum of $19,875.00;

2. James W. Gregory is entitled to recover from the defendant the sum of $27,045.00; and

3. Richard Ridgewell is entitled to recover from the defendant the sum of $21,024.00.

The Court finds that plaintiffs Bass, Castle, Fearn, Gregory, Norton, Papastrat, and Ridgewell, would be made whole by the damages previously awarded to them and should recover nothing from the defendant for front pay damages. Accordingly, the Court rejects all three of the plaintiffs' proposed front pay damage award alternatives for plaintiffs Bass, Fearn, Gregory, Norton, Papastrat, and Ridgewell. Both the plaintiffs and the defendant agree that plaintiffs Breyton, Castle (except under Alternative A, $1,193, see Figure 1), Moore, and Woodworth are entitled to no front pay under any of the proposed alternatives. The parties, therefore, essentially concede that these four plaintiffs have reached comparability and are not entitled to any future damages to make them whole. Accordingly, the Court finds that plaintiffs Breyton, Castle, Norton, and Woodworth would be made whole by the damages previously awarded (if the jury's verdicts on liability are to stand) and should recover nothing from the defendant. As to the remaining plaintiffs (Bass, Breyton, Castle, Moore, Norton, Papastrat, and Woodworth) the Court will enter judgments in favor of the defendant and against those plaintiffs as follows:

1. Shelby D. Bass, Jr. shall recover nothing from the defendant for front pay damages;

2. Gerard E. Breyton shall recover nothing from the defendant for front pay damages;
3. Charles A. Castle shall recover nothing from the defendant for front pay damages;
4. Harry K. Moore shall recover nothing from the defendant for front pay damages;
5. John S. Norton shall recover nothing from the defendant for front pay damages;
6. Chris Papastrat shall recover nothing from the defendant for front pay damages; and
7. Donald J. Woodworth shall recover nothing from the defendant for front pay damages.

Plaintiffs argue that a separate award for lost pension benefits should be made in addition to any award they might receive for front pay. Under this theory plaintiffs essentially treat front pay and lost pension benefits as two different items of damage, relying exclusively on *Ventura v. Federated Life Insurance Co.*, 571 F.Supp. 48 (N.D.Ill.1983). The defendant, on the other hand, contends that the plaintiffs' separation of lost pension benefits from front pay precludes plaintiffs from reaching comparability and causes their damages to accrue until they reach retirement age. Defendant objects to plaintiffs' computation of front pay in this manner, arguing that separating front pay into two categories (front pay and lost pension benefits) is contrary to the "financial comparability"/"total packages" standard. Defendant would include lost pension benefits in the category of front pay damages and would not make a separate award for lost pension benefits.

Plaintiffs' heavy reliance on *Ventura*, 571 F.Supp. 48, for support of its argument that a separate award for lost pension benefits should be made in addition to any award for front pay necessitates a close analysis of the case. In *Ventura*, the court held that "questions of front pay or benefits [will] be tried directly to the court after the jury has determined liability and legal damages." *Id.* at 51. This ruling came about as a result of the defendant's motion *in limine* which sought to "prevent plaintiff from introducing any evidence relating to loss of future pension benefits that assumes or is based upon employment after the date damages are settled." *Id.* at 49. The court never actually ruled as to whether or not the plaintiff was entitled to lost pension benefits.

Plaintiff in *Ventura* was 56 at the time of the suit. He was vested in the defendant's retirement plan and would receive some pension regardless of his lawsuit's outcome. *Id.* However the court addressed the question of how much could plaintiff have his pension increased. Plaintiff was seeking an award of benefits equal to the amount (at present value) he would have received had he stayed with the defendant.

The district court approved of and followed *Koyen v. Consolidated Edison Co. of New York*, 560 F.Supp. 1161, 1169 (S.D. N.Y.1983), which in part held that prospective benefits are available under the ADEA. *Koyen* did not award damages for lost pension benefits, but did award plaintiff front pay damages (less the pension he was receiving) for a twenty-three month period at which time he reached 70—beyond the Act's protection. The court in *Ventura* was concerned that an ADEA plaintiff whose new job does not provide the pension he enjoyed at his old job

"cannot be made whole for the discrimination unless he is given prospective benefits. To hold that such benefits are never available would run counter to the remedial purposes of the ADEA ... and would ignore the authority given district courts to award equitable relief beyond the specific wage or salary losses attributable to a wrongful employment action...." *Id.* [citations omitted].

The facts in *Ventura* distinguish it from the instant case. As the court stated:

This is not a case where the plaintiff is still at a young age and where an award of prospective benefits would be entirely speculative. Plaintiff is now 56 years old, and according to an exhibit which

plaintiff submitted with his brief on this motion, plaintiff's prospective benefits will be calculated only up until his 62nd birthday. This exhibit purports to calculate precisely what those benefits would be based on the actuarial assumptions of a professionally-trained actuarial and employee benefit consultant. Further, *plaintiff had worked for defendant for 20 years before his dismissal, and* according to plaintiff's complaint, *he had an oral contract with defendant's president pursuant to which plaintiff would be employed until retirement.* Under these circumstances, we cannot hold before trial that as a matter of law, this plaintiff cannot seek pension benefits based on presumed future years of employment. The district court may presume, absent evidence to the contrary, that an illegally discharged employee would have continued working for the employer until he or she reached normal retirement age. *Gibson v. Mohawk Rubber Company,* 695 F.2d 1093, 1101 n. 8 (8th Cir.1982). Accordingly, we deny defendant's motion to exclude such evidence entirely.

*Id.* at 50–51 [emphasis added].

Plaintiffs in the case at bar urge this Court to apply the *"Ventura* pension theory" and award any plaintiff denied reinstatement the value of his lost pension benefits in addition to any front pay award.

Plaintiffs read *Ventura* as advocating that the period for which lost pension benefits may be recovered should extend up to the time a plaintiff would become eligible "for early or regular retirement, whichever occurs first." (Plaintiff's post-trial brief at 45). The presumption upon which such a damage calculation would be made treats the employee as if he would never be terminated or die before reaching retirement age. This presumption is taken from language in *Gibson,* 695 F.2d at 1101 n. 8. The entire footnote reads as follows: "In determining whether to award equitable relief and, if so, what kind, a district court *generally will assume,* absent evidence to the contrary, that the illegally discharged employee would have continued working for the employer until he or she reached normal retirement age." *Id.* [emphasis added]. This certainly cannot be classified as a hard and fast rule *requiring* the Court to assume all plaintiffs in the instant case would have worked for Sangamo Weston until they reached retirement age. Yet, this apparently is what plaintiffs want.[3] Front pay is an equitable remedy governed by the trial court's discretion. As such, the court must look at all the circumstances of each case and keep in mind the "make whole" intent behind the ADEA.

The circumstances of the instant case differ from those in *Ventura.* The plain-

---

**3.** Indeed, the Court notes that there is evidence which might show some of the plaintiffs would not have made it to full retirement. Evidence showing incompetence or conflicts with supervisors (Castle); elimination of a job through reorganization (affecting Bass, Breyton, Fearn, Gregory, Norton and Ridgewell); and other interests (Gregory would have eventually left to start his own business and Norton would have retired early to North Carolina even if not terminated) casts some doubt on plaintiffs' assertion that all of them would have stayed until their retirement age. To find that any one of the plaintiffs or all of them, would have been terminated before retirement age for one reason or another would be pure speculation. But, it would also be pure speculation to find that all plaintiffs would have stayed with Sangamo Weston until their retirement age in light of some of the evidence tending to show otherwise. The Court is aware that when resolving conflicts as to damages, any conflicts should be resolved

against the discriminating employer, *Rasimas v. Michigan Department of Mental Health,* 714 F.2d 614, 628 (6th Cir.1983), *cert. denied,* 466 U.S. 950, 104 S.Ct. 2151, 80 L.Ed.2d 537 (1984) (Title VII action); *Johnson v. Goodyear Tire & Rubber Co.,* 491 F.2d 1364, 1380 (5th Cir.1974), and so instructed the jury. In exercising its discretion in determining whether to award plaintiffs the lost pension benefits which they seek, the Court returns to questions which arise when equitable relief is requested: What is fair? or What will make the plaintiffs whole?

It is unnecessary for this Court to determine whether or not any of the plaintiffs would have made it to retirement due to the Court's finding that—assuming the jury's verdicts on liability and the judgments for damages previously entered by the Court are reinstated—the plaintiffs have been made whole and, therefore, are not entitled to any further damages for lost pension benefits.

tiff in *Ventura* had worked for the defendant for 20 years and he allegedly had been promised he would remain with the defendant until his retirement. *Id.* The court stated: "[u]nder these circumstances, we cannot hold before trial that as a matter of law, this plaintiff cannot seek pension benefits based on presumed future years of employment." *Id.* at 51. However, the court in *Ventura* never reached the question of whether or not the plaintiff was entitled to an award for his lost pension. It merely allowed him to make the argument and present evidence to the court. The court in *Ventura* also did not indicate what factors it would consider in determining whether a plaintiff was entitled to an award for lost pension benefits, probably because the case had yet to be tried. However, if the case were fully tried and the issue of whether a plaintiff is entitled to damages for lost pension benefits did arise, the court in *Ventura* (like this Court) would certainly have to consider all of the circumstances of the case—including any damages awarded—in an effort to ensure the plaintiff was made whole and did not receive a windfall.

In the instant case, plaintiffs were allowed to present to the Court their theory and evidence of what should be included in an award of front pay damages, as the court in *Ventura* allowed. Thus, this Court must now determine from all the circumstances of the case, whether the plaintiffs are entitled to damages for lost pension benefits in order to make them whole. Regardless of how plaintiffs wish to characterize damages for lost pension benefits (i.e. as lost pension or as a part of front pay), such damages are still prospective damages. Whether to award future damages in ADEA cases, and the amount, lies within the Court's discretion and must ultimately be fair in light of all the circumstances of the case.

As previously discussed, there are no specific rules to guide the Court's discretion in determining whether to award front pay. The Eleventh Circuit has clearly noted that front pay may be appropriate in lieu of reinstatement, but has not indicated how front pay should be calculated or whether an award of front pay should include a separate award for lost pension benefits. Thus, plaintiffs' attempts to convince this Court to award front pay and pension benefits under *Ventura* will be viewed as only suggestions or recommendations.

█ The Court has carefully reviewed the parties' briefs, arguments, and the case law concerning the above issue. The Court finds that the plaintiffs' request for lost pension benefits must be rejected. The Court further finds that the plaintiffs would be made whole and would not be entitled to any awards for lost pension benefits in the event that the judgments entered by the Court are allowed to stand.

It must be emphasized that the findings heretofore made by this Court as to front pay damages and the judgments which this Court will enter for the plaintiffs are conditioned upon the jury's verdicts on the issues of liability, its findings as to willfulness and back pay damages, and this Court's award of liquidated damages remaining undisturbed. The above findings and judgments have been entered without ruling on the defendant's motion for directed verdict or alternative motion for judgment notwithstanding the verdict, to which the Court now turns its attention.

The Court has before it defendant's motion for directed verdict made at the close of all the evidence and defendant's oral motion for judgment notwithstanding the verdict made prior to the oral argument heard by the Court on March 6, 1986, which the Court notes was intended to encompass all matters and issues raised by both motions. The Court has concluded that since judgments will be entered in favor of the plaintiffs, outlining how the Court would rule in the event the jury's verdicts and findings are upheld, it will address and rule upon the defendant's motion for judgment notwithstanding the verdict. In the interest of judicial economy this procedure has been taken to put this case in a posture so that if this Court's ruling on the defend-

ant's motion for judgment notwithstanding the verdict is overturned, and barring any major error during the trial which would necessitate a retrial, the case may be finalized without the need for a remand to this Court for findings as to front pay, liquidated damages, and final entries of judgment for each plaintiff.

### C. Defendant's Motion For Judgment Notwithstanding the Verdict.

The standard for evaluating a motion for judgment n.o.v. was plainly set forth by the former Fifth Circuit in *Boeing Company v. Shipman,* 411 F.2d 365, 374–75 (5th Cir. 1969) (*en banc*). The *Boeing* standard has been applied to ADEA cases in the Eleventh Circuit on several occasions. *See Lindsey v. American Cast Iron Pipe Co.,* 772 F.2d 799, 801 (11th Cir.1985); *Buckley v. Hospital Corporation of America, Inc.,* 758 F.2d 1525, 1527 (11th Cir.1985). Without setting forth the lengthy *Boeing* standard verbatim, the Court notes that in resolving the instant motion it must consider all of the evidence in a light most favorable to the nonmoving plaintiffs without weighing the evidence or evaluating the witnesses' credibility. For a motion for judgment n.o.v. to be properly denied, and to support submitting a case to the jury, there must be "substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions.... A mere scintilla of evidence is insufficient to present a question for the jury." *Boeing,* 411 F.2d at 374–75. *See also Krieg v. Paul Revere Life Insurance Co.,* 718 F.2d 998 (11th Cir.1983) (district court's granting of judgment n.o.v. in ADEA action was affirmed under *Boeing* standard); *O'Donnell v. Georgia Osteopathic Hospital, Inc.,* 748 F.2d 1543 (11th Cir.1984).

The plaintiffs proceeded under the disparate treatment theory, alleging that there was a pattern or practice of age discrimination within Sangamo Weston which was the reason behind each of the plaintiffs' terminations. (Plaintiffs' trial brief at 10). Because the elements varied as to some of the plaintiffs, to facilitate the jury's consideration of the required proof, they were divided into three categories: 1) Charles Castle; 2) Harry Moore; and 3) the remaining eight plaintiffs (Shelby Bass, Gerard Breyton, Edward Fearn, James Gregory, John Norton, Chris Papastrat, Richard Ridgewell, and Donald Woodworth). Castle was terminated in May, 1979; Moore resigned (the jury found he was constructively discharged) in October, 1979; and the remaining eight plaintiffs were terminated as part of a reduction-in-force [or r.i.f.] in June, 1979.

Plaintiffs' case hinged on the establishment of a pattern or practice of age discrimination by Sangamo Weston's management. Plaintiffs attempted to accomplish this by filling the record with testimony of witnesses who recalled countless age related comments made primarily by two management officials at Sangamo Weston. Clearly the vast majority of the age related comments (actually all of such comments except one) were attributed to Anthony J. (Tony) Martin, the General Manager of Sangamo Weston's Sarasota plant. All but one of the ten plaintiffs (Harry Moore) worked at the Sarasota plant. One age related comment was attributed to Kent Morgan, Director of the Data Systems Division (the department in which all of the plaintiffs worked). Morgan was one of several department managers who reported directly to Tony Martin during the relevant time period.

From all these comments, the plaintiffs attempted (and from the jury's verdicts succeeded) to prove that Tony Martin was biased against the older employees at the Sarasota plant, that a common thread of age biasness existed between Martin and Morgan, and that Martin influenced Morgan to terminate older employees in his (Morgan's) department. The comments attributable to Tony Martin included Martin's references to "older employees" as "old farts," "old bastards," and in one instance as an "old cow." From these comments plaintiffs suggest there is sufficient evidence to support inferences that Tony Mar-

tin foisted his age biasness onto Kent Morgan, influencing Morgan into terminating employees in his department who were over 40, and that Kent Morgan himself had an age bias, as evidenced by the comment he allegedly made.

In support of its motions for judgment notwithstanding the verdict defendant argues that "there is such an overwhelming amount of evidence that reasonable men could not differ in concluding that Defendant's actions with respect to each and every Plaintiff were based on legitimate business reasons unrelated to age." Defendant also contends that plaintiffs did not provide any evidence to show that its proffered legitimate business reasons were pretextual. (Defendant's post trial brief on liability at 3). As a result, defendant submits that each plaintiff failed to meet his ultimate burden of showing that he was intentionally discriminated against in violation of the ADEA. *Id.* at 4.

The plaintiffs on the other hand contend that their prima facie cases were established "by significant, direct evidence." This evidence, plaintiffs argue, was sufficient to support submitting the case to the jury and the jury's verdict. (Plaintiff's brief in support of final judgment at 7–9). The Court will address the defendant's motion for judgment notwithstanding the verdict as it applies to each plaintiff individually.

### 1. *Charles Castle.*

Castle was terminated in May, 1979, almost one month before those plaintiffs involved in the reduction in force were terminated. Castle's direct supervisor and the man responsible for his termination was Jim Williams, Director of the Data Recorder Division. Williams started in this position on April 1, 1979, and reported directly to Tony Martin, the Sarasota plant's general manager.

In its motion for j.n.o.v., the defendant argues that Castle was terminated for cause (a legitimate business reason), therefore, it is entitled to judgment in its favor. Sangamo Weston notes that Castle could

not get along with his boss Jim Williams, refused to obey Williams' suggestions, considered Williams a "young alien" who knew nothing about the tape recorder industry, and disagreed with Williams as to the direction the company should be headed as far as the manufacturing and marketing of tape recorders was concerned. The record substantiates Castle's differences with Williams. Castle testified that he had a "personality conflict" with Williams at the time of his termination and further testified that he would not cooperate with Williams if he thought a business opportunity was incorrect. Castle's testimony inferred that he would buck authority. Castle admitted that he thought Williams' professional judgment was inadequate and that he had a fundamental disagreement with Williams about the approaches to follow as to tape recorder content. Castle thought that Williams' approach was wrong. Since this testimony came from Castle himself, it is taken in the light most favorable to him. Based on such evidence, defendant submits that there is no evidence that Castle's termination was related to his age.

Castle contends that there was evidence that Williams, "the British protege of the General Manager [Tony Martin], shared his compatriot's prejudice against older employees, and fired Mr. Castle as an example to Mr. Morgan, who was apparently dragging his feet at the time." (Plaintiffs' brief in support of final judgment at 17). Castle also contends that the reduction in force was planned to take place during the time that he was terminated and that Williams did not follow Sangamo Weston's regular personnel practices in terminating him. From this evidence, plaintiff argues that the jury could have inferred age was a determining factor in his termination and the business reason was pretext.

The Court disagrees with plaintiff's contentions. The record does not reflect any age related remarks which could be attributed to Jim Williams. Neither Castle nor any of the other witnesses testified that they ever heard Williams say anything

derrogatory about age. Plaintiff struggles to make a connection between Williams' and Martin's friendship by inferring that they shared the same prejudice against older employees. Such an inference is not substantial evidence which could support submitting this case to the jury or the jury's verdict itself. Such evidence might rise to being considered a "scintilla of evidence," but even if it is considered as such, a "scintilla of evidence" is not enough to create a jury question. *Boeing, supra,* at 375. The mere fact that the reduction in force might have been scheduled for an earlier date which was around the time when Castle was terminated also is not probative of age discrimination and is insufficient to give rise to an inference of discrimination or to create a jury question. The same can be said for the fact that there was evidence that Williams did not follow the standard procedure in terminating Castle.

The remarks allegedly made by Tony Martin and Kent Morgan, which plaintiffs contend are direct or substantial evidence of age discrimination, have no relevance to Castle's termination. Castle was terminated by Williams and there is no evidence that either Martin or Morgan were involved in that decision. Therefore, the age related remarks made by Martin and Morgan are not considered in evaluating the instant motion as it relates to Charles Castle. However, assuming the remarks did have some relevance to Castle's termination, the Court would still find that there was insufficient evidence to support the jury's verdict on liability.

Defendant contends that Castle must "prove by a preponderance of the evidence that he was replaced by a younger person who assumed all his job duties" and that "the defendant's stated reason of insubordination was a pretext or coverup for his termination and that age was a determining factor for his discharge." (Defendant's proposed findings of fact and conclusions of law—liability at 13). "The fact that plaintiff's replacements were also within the protected class does not preclude a finding of age discrimination." *Buckley, supra,* 758 F.2d at 1530 n. 2, citing, *Goldstein,* 758 F.2d 1435. In *Buckley,* there was evidence that the plaintiff's duties were taken over by two individuals who were not outside the protected class under the ADEA. *Id.* at 1530. Thus, defendant's inference that plaintiff must prove he was replaced by a younger person who assumed all his duties is not accurate. The focus of this Court's inquiry is whether there was substantial evidence to support the jury's verdict or to create a jury question. Castle's admission that he had a personality conflict with Williams along with Castle's negative feelings toward Williams' competency provide a strong legitimate reason for his termination. The termination of an employee such as Castle based on his personality conflict with his superior and his feelings about his superior's competence does not give rise to a violation of the ADEA. *Graefenhain v. Pabst Brewing Co.,* 620 F.Supp. 696, 703 (E.D.Wis.1985), citing, *Ackerman v. Diamond Shamrock,* 670 F.2d 66, 70 (6th Cir.1982).

Defendant proposes a conclusion of law that would require the plaintiffs prove the articulated legitimate reasons were pretextual "or that 'but for' their ages, the adverse employment action would not have" taken place. However, this is not the proper standard in the Eleventh Circuit for a case in this posture. "In satisfying the ultimate burden of proving that the discharge was on account of age, a plaintiff need not establish that age was the sole reason for his termination, but only that age was a determinative factor on the employer's decision to fire him." *Anderson v. Savage Laboratories, Inc.,* 675 F.2d at 1224. Thus, a case need not be proved by the "but for" test as defendant suggests. Since there is no direct evidence of age discrimination as to Charles Castle, the Court can properly use the *McDonnell Douglas* framework. Under these circumstances, as to Castle, "the issue is whether there is sufficient evidence to support the jury's verdict that plaintiff carried the burden of showing that the company's proffered reasons for the discharge were mere-

ly pretext for" plaintiff's termination. *Krieg v. Paul Revere Life Insurance Co.,* 718 F.2d 998, 1001 (11th Cir.1982). *Compare, Lindsey v. American Cast Iron Pipe Co.,* 772 F.2d 799, 801–02 (11th Cir.1985) (where there is *direct* evidence of discrimination, *McDonnell Douglas* framework does not apply).

In sum, as to plaintiff Charles Castle, the Court concludes that the plaintiff presented insufficient evidence to support the jury's verdict. The inferences which the plaintiff seeks to draw from the evidence do not give rise to even a scintilla of evidence that Charles Castle's termination by Jim Williams was based on age. Reasonable persons could not differ in this conclusion when the irrelevant comments made by Morgan and Martin are eliminated from consideration of Castle's case. Accordingly, defendant's motion for judgment notwithstanding the verdict as to Charles Castle will be granted and Castle's action dismissed.

### 2. *Harry Moore.*

Harry Moore's case differs from the rest of the plaintiffs' cases, as it involves a constructive discharge. Moore was demoted from the position of Eastern Regional Sales Manager for the Data Recorder Division to that of a salesman, in October, 1979, and voluntarily resigned before the end of the month. (Filing 200, T173:7–9). There is no dispute that he was not a part of the reduction in force. Moore's immediate supervisor prior to his demotion was Gerald Ramsey, Sales Manager, who reported to James Williams. Prior to Moore's demotion in October, 1979, Ramsey was replaced by Dan Gincig as Sales Manager. It was Gincig who ultimately gave Moore the news that he was being demoted to salesman and being relieved of his managerial duties. Moore testified that Gincig gave him the option to take a demotion to Sales Engineer, which would involve a $5,000 drop in pay and loss of management responsibilities for his territory, or four weeks of severance pay if Moore de-

cided not to accept the new position. (Filing 200, T167:12–24).

The defendant argues that it is entitled to a directed verdict or judgment notwithstanding the verdict as to Moore for essentially two reasons. First, defendant contends that Moore was demoted for a legitimate business reason not related to age, i.e., Moore did not meet his sales quotas for 1978 or 1979. Second, defendant argues that Moore failed to prove he was constructively discharged from his position with Sangamo Weston. (Defendant's brief at 12–13). Moore argues that he produced sufficient evidence from which the jury could infer that he was constructively discharged and that age was a determining factor in his demotion. (Plaintiffs' brief at 17).

The jury was required to address the issue of Moore's constructive discharge in the special interrogatories propounded to it by the Court. The jury found that Moore was constructively discharged. Turning first to the evidence that relates to this issue, Moore testified that Gincig informed him that the sales regions were to be reorganized, with the number of regions reduced from three to two. The man who replaced Moore (Bill Vernoix) and who became Moore's regional manager was approximately 32 years old.

Moore testified that his demotion from regional manager to sales engineer made his position intolerable for several reasons. First, Moore felt that his future at Sangamo Weston was dead and second, Moore had no respect for Vernoix as a salesman, manager, or sales manager in the Washington, D.C. area because, according to Moore, the new manager had little experience in sales or management and was unfamiliar with the territory and the customers. Moore testified that: "I would have found it very, very difficult to report to a man who I have no respect for." (Filing 200, T171:9–22). Moore also testified that the demotion made it very difficult for him to sell himself and his products to his customers, because Moore was "very humiliated," and found it hard to face his customers as

a sales engineer when he had been dealing with them as a regional manager. (Filing 200, T172:6–8). Moore's new position also made him feel "very uncomfortable" and he felt that due to various production problems he did not believe that Sangamo Weston was a viable company which was "trying to sell magnetic tape recorders." (Filing 200, T172:9–11, 17–19).

■ The standard governing the determination of whether an employee has been constructively discharged is as follows:

> The general rule is that if the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer has encompassed a constructive discharge and is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee.

*Lewis v. Federal Prison Industries, Inc.,* 786 F.2d 1537, 1542–43 n. 4 (11th Cir.1986), *quoting, Young v. Southwestern Savings & Loan Association,* 509 F.2d 140, 144 (5th Cir.1975). *See also, Buckley v. Hospital Corp. of America, Inc.,* 758 F.2d at 1530. In order to show that he was constructively discharged, "the employee must prove that his working conditions were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Wardwell v. School Board of Palm Beach County, Florida,* 786 F.2d 1554, 1557 (11th Cir.1986), citing, *Bourque v. Powell Electrical Manufacturing Co.,* 617 F.2d 61 (5th Cir.1980); and *Young* 509 F.2d 140, 144.

In *Buckley, supra,* the court found that there was sufficient evidence to create a jury question on the issue of plaintiff's constructive discharge. However, there was a sharp dissent (Hill, J.) which applied an "objective test", and found that the plaintiff's "humiliation over losing her title and supervisory power, no matter how subjectively painful and deeply felt, does not not [sic] make her transfer to staff nurse so objectively intolerable as to 'force' her resignation." *Id.,* at 1531 (emphasis in original, citations omitted). The cases cited by Judge Hill support the proposition that mere humiliation or loss of prestige over losing one's management level position does not make a plaintiff's working conditions so intolerable as to justify a finding that plaintiff had been constructively discharged. *See, Alicea Roasado v. Garcia Santiago,* 562 F.2d 114, 119–20 (1st Cir. 1977); *Neale v. Dillon,* 534 F.Supp. 1381, 1390 (E.D.N.Y.), *aff'd,* 714 F.2d 116 (2d Cir.1982). *See also, Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255–56 (4th Cir.), *cert. denied* —— U.S. ——, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986).

■ The evidence presented by Moore in support of his claim that he was constructively discharged indicated that he was humiliated and suffered a loss of prestige due to the demotion from sales manager to salesman. Looking at all the evidence in the light most favorable to Moore, the Court finds that the evidence is insufficient to support the jury's finding that Moore was constructively discharged. Accordingly, the defendant's motion for judgment notwithstanding the verdict will be granted as to plaintiff Harry Moore.

Assuming, *arguendo,* that there is sufficient evidence to support the jury's finding that Moore was constructively discharged, the Court turns to the jury's finding that age was a determining factor in Moore's discharge. With regard to this aspect of the jury's verdict, defendant argues that Moore was discharged or demoted because he failed to meet his sales quotas in 1978 and 1979. Defendant argues that Moore did not present any evidence showing that this legitimate business reason was a pretext for age discrimination or that Moore was demoted because of his age. Plaintiff contends that there is sufficient evidence to support the jury's finding of age discrimination.

Moore admitted that he was given a sales quota each year and that he failed to meet his quotas for the years 1978 and 1979. In fact, in 1978 and 1979, Moore sold only 41% and 57% of his quota, respectively. Moore attributed his failure to meet the quotas on the poor quality and slow production of

Sangamo Weston during those years, however, he admitted that he was involved in setting his quotas, and if such production problems were foreseen he "probably would" take them into account in setting his quotas. There is no direct evidence linking Moore's demotion to an age bias on the part of his supervisors. The mere fact that he was relieved of his management responsibilities and replaced by a younger person who took charge of a reorganized territory does not give rise to an inference of age discrimination. Even if an inference of discrimination can be drawn from such evidence, the defendant presented a legitimate reason for demoting Moore (failure to meet sales quotas) and plaintiff presented no evidence showing this reason was pretext. *Krieg*, 718 F.2d at 1001. Accordingly, the Court finds that plaintiff Moore has failed to present sufficient evidence to show that Sangamo Weston's reasons for demoting him were pretext for age discrimination.[4] Furthermore, numerous cases would support a finding for the defendant when a plaintiff is terminated for performance reasons. *See Moore v. Sears, Roebuck and Co.*, 683 F.2d 1321 (11th Cir. 1982), *Halsell v. Kimberly-Clark Corp.*, 683 F.2d 285 (8th Cir.1982), *cert. denied*, 459 U.S. 1205, 103 S.Ct. 1194, 75 L.Ed.2d 438 (1983); *Allison v. Western Union Telegraph Co.*, 680 F.2d 1318 (11th Cir. 1982); *Stendebach v. CPC International, Inc.*, 691 F.2d 735 (5th Cir.1983); and *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230 (4th Cir.1982). Therefore, the Court finds that even if Moore did establish that he was constructively discharged, viewing all the evidence in the light most favorable to him, Moore failed to present sufficient evidence to support the jury's finding that his age was a determining factor in his termination.

### 3. *The reduction-in-force plaintiffs.*

The remaining plaintiffs (Shelby Bass, Gerard Breyton, Edward Fearn, James Gregory, John Norton, Chris Papastrat, Richard Ridgewell, and Donald Woodworth) can be categorized as those persons who were involved in the June, 1979, reduction-in-force.[5] Each plaintiff's case must be considered separately in determining whether to grant or deny the defendant's motion for judgment notwithstanding the verdict. However, in assessing whether

---

4. The Court's limited focus on whether there is any evidence showing Sangamo Weston's reasons were pretext for an age related motive is not contrary to *Lindsey*, 772 F.2d 799, 802, which held that it was error for a district court to rely "on a *McDonnell Douglas* analysis to override a jury's verdict" where there was direct evidence of discrimination, since Moore presented no direct evidence of age discrimination. The main question with which this Court must be concerned in analyzing the instant motion for j.n.o.v. as to each plaintiff is:

"whether the record contains enough evidence to justify a rational jury in finding that age was a determining factor in what happened to plaintiffs, a factor in the absence of which the employer would not have taken the adverse action it did. See *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 714–15 [103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403] (1983); *Gilkerson v. Toastmaster, Inc.*, 770 F.2d 133, 135 (8th Cir.1985). The three-stage order of proof and the presumptions described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (claim of racial discrimination under Title VII), an analytical scheme which is applied also in age-discrimination cases, is useful to the court in structuring the proof while the trial is in progress, and, in cases tried to the court without a jury, as a framework against which the court can view the evidence in making its findings. But once a finding of discrimination *vel non* has been made, and the resulting judgment is being evaluated on appeal, these presumptions fade away, and the appellate court should simply study the record with a view to determining whether the evidence is sufficient to support whatever finding was made at trial. This is the teaching of *Aikens*, supra."

*Barber v. American Airlines, Inc.*, 791 F.2d 658, 659–60 (8th Cir.1986).

5. Plaintiff Ridgewell did not work in the Data Systems Division, and there is a question as to whether he was actually a part of Sangamo Weston and thus part of the r.i.f. Nonetheless, the Court finds that there is sufficient evidence to prove that Ridgewell was indeed considered a part of the Sangamo Weston organization even though he did technically work for the British company Solartron. Therefore, Ridgewell will be considered along with the other plaintiffs discharged from Sangamo Weston in the r.i.f. of June, 1979.

there was sufficient evidence to support the jury's verdict and finding that each plaintiff's termination was based on his age, the Court must analyze all the evidence as it relates to each plaintiff. This is complicated by the fact that a large part of the plaintiffs' case rested on the establishment of a pattern or practice of age discrimination on the part of the defendant's management, primarily by way of age related statements made by Tony Martin and Kent Morgan.

The plaintiffs contend that there is "substantial direct evidence" to support the jury's verdict that each plaintiff had been discharged because of his age. (Plaintiffs' post trial brief at 9). As a result of the direct evidence of discrimination, plaintiffs contend, the defendant's rebuttal burden increases from merely articulating legitimate reasons to proving those reasons by a preponderance of the evidence. *Id.*, citing *Lee v. Russell County Board of Education*, 684 F.2d 769, 774 (11th Cir.1982). Finally, plaintiffs argue that the evidence of legitimate reasons for each plaintiff's discharge "merely created a jury question as to whether the defendant proved by a preponderance of the evidence that the decisions to discharge the ten plaintiffs would have been reached even in the absence of age discrimination." (Plaintiff's post trial brief at 10). The defendant contends that there is not even a scintilla of evidence to support a finding of discrimination as to the reduction-in-force plaintiffs. (Defendant's post-trial brief on liability at 3).

 Plaintiffs' contention that there exists some direct evidence of discrimination, as that term is defined by the Eleventh Circuit, further complicates matters due to the confusion surrounding the Eleventh Circuit's evolution and effect of "direct evidence" in a discrimination action. See *Spanier v. Morrison's Management Services*, 611 F.Supp. 642 (N.D.Ala.1985) (Propst, J.) (analyzing recent case law and noting the problems associated with the direct evidence standard). In the Eleventh Circuit, "[W]here a case of discrimination is made out by direct evidence, reliance on the four-

part [*McDonnell Douglas*] test developed for circumstantial evidence is . . . unnecessary." *Lee v. Russell County Board of Education*, 684 F.2d 769, 774 (11th Cir. 1982) (Section 1983 action). Under the Eleventh Circuit's reasoning, once a case of discrimination is established by direct evidence, the *McDonnell Douglas* framework is cast aside, and "if the trier of fact believes the prima facie evidence the ultimate issue of discrimination is proved; no inference is required." *Id.* No longer can a defendant seek to rebut a case of discrimination established by direct evidence simply by articulating a legitimate nondiscriminatory reason under *McDonnell Douglas*. To do so, reasons the Eleventh Circuit in *Lee*, "would be to 'stick' [plaintiff] on the four prongs of *McDonnell Douglas* when he has already shown intentional discrimination by direct evidence." *Id.* at 774, n. 6, quoting *Ramirez v. Sloss*, 615 F.2d 163, 169 n. 10 (5th Cir.1980). Thus, the *McDonnell Douglas* framework can only be used "to focus the inquiry where circumstantial evidence is relied on." *Id.* at 774.

 In the case where "strong, direct evidence is presented" the employer's rebuttal burden increases from one of merely producing evidence of a nondiscriminatory reason (under *McDonnell Douglas*) to one requiring the employer to prove its nondiscriminatory reason by a preponderance of the evidence (under *Mt. Healthy City School District v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977)). *Id.* "Once an unconstitutional motive is proved to have been a significant or substantial factor in an employment decision, defendant can rebut only by proving by a preponderance of the evidence that the same decision would have been reached even absent the presence of that factor." *Id.*

The reasoning behind *Lee* and the changing legal standard was reaffirmed in *Bell v. Birmingham Linen Service*, 715 F.2d 1552, 1557 (11th Cir.1983), *cert. denied*, 476 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984) (Title VII action). In *Bell* the court noted that "[i]t should be clear that the

*McDonnell Douglas* method of proving a prima facie case pertains primarily, if not exclusively, to situations where direct evidence of discrimination is lacking." *Id.* at 1556. Relying on the previous decision in *Lee,* the court in *Bell* stated, "If the evidence consists of direct testimony that the defendant acted with a discriminatory motive, and the trier of fact accepts this testimony, the ultimate issue of discrimination is proved. Defendant cannot refute this evidence by mere articulation of other reasons; the legal standard changes dramatically...." *Id.* at 1557.

As the court in *Spanier* noted, *Lee* and *Bell* appear to eliminate a plaintiff having to show a "causal factor in connection with direct evidence as it relates to the plaintiff's burden of persuasion." This Court tends to agree with Judge Propst's criticism of the Eleventh Circuit's changing standard as enunciated in the *Lee* and *Bell* decisions. In *Spanier,* the court found that there was "direct evidence" of discrimination and denied the defendant's motion for directed verdict. *Id.* at 645. The court's comment that "[t]here is a real question as to whether the 'direct evidence' of discrimination in this case was *strong* evidence" would indicate that the court in *Spanier,* like this Court, had a difficult time resolving the strength of what might be considered "direct evidence."

What evidence the Eleventh Circuit considers to be "direct" or "significant" evidence of discrimination has been explained in *Buckley v. Hospital Corporation of America, Inc.,* 758 F.2d 1525, 1530 (11th Cir.1985) (when viewed in the light most favorable to the plaintiff, significant evidence of age discrimination included an administrator's expression of surprise at the longevity of staff members; as well as, the administrator's comments that the defendant "hospital needed 'new blood,'" that he intended to recruit younger doctors and nurses, and that "plaintiff's 'advanced age'" caused her stress); *Lindsey v. American Cast Iron Pipe Co.,* 772 F.2d 799, 802 (11th Cir.1985) (testimony that plaintiff's supervisor told him "the company wanted a younger person to fill the position, if believed, constitutes sufficient direct evidence to remove this case from the ambit of *McDonnell Douglas*."); *Goldstein v. Manhatten Industries, Inc.,* 758 F.2d 1435, 1440–41 (11th Cir.1985) (evidence showing other salesmen over 40 were replaced by younger men in same year plaintiff was fired and evidence showing the salesmen's age, hiring date, and firing date was relevant to the issue of whether there was a pattern of replacing older salesmen with younger ones); *O'Donnell v. Georgia Osteopathic Hospital, Inc.,* 748 F.2d 1543, 1550 (11th Cir.1984) (favorable experience "clearly is sufficient to allow a reasonable factfinder to decide that age was a determining factor" in plaintiff's discharge); and *Wilson v. City of Aliceville,* 779 F.2d 631, 634–35 (11th Cir.1986) (Title VII action in which the district court erred by refusing to admit into evidence a witness' affidavit which told of a racial slur made by a city official. Had the statement been admitted, "the [advisory] jury might well have considered it direct evidence of discrimination," the court noted, and the court also found the racial slur to be "highly probative evidence of illegal discrimination.").

These cases indicate a rather liberal definition as to what might be considered "direct" or "significant" evidence of discrimination, however, the specific facts in several of the cases are distinguishable from the facts in the instant case. These distinctions are crucial to determining whether there was any "direct" evidence of discrimination presented in this case.

In *Buckley,* the comments which the court found to be "direct" or "significant" evidence of age discrimination came from an administrator of the hospital where the plaintiff worked. The administrator was the person who actually terminated the plaintiff, *Id.* at 1529, and it could be assumed from his actions and his position that he had the sole authority to do so.

In *Lindsey,* the comments which the court found to present sufficient evidence to support the jury's verdict and to take the

case out of the *McDonnell Douglas* framework, were allegedly made by the person in charge of the division which was made up of plaintiff's and six other departments, and the manager of the department in which plaintiff worked. *Id.* at 801. Not surprisingly, the testimony as to what was said was contradicting. It is not clear from the opinion whether the persons who allegedly made the statements had the authority to promote the plaintiff to the position which he had sought.

In *Goldstein,* the individual who fired the plaintiffs occupied the top management position in the division in which the plaintiff worked. The head of the division and the national sales manager determined which salesmen would be cut back. *Id.* at 1438–39. From the opinion, it does not appear that the division head required any approval from higher up in the organization to fire the plaintiff, although this is not made clear. This was accomplished by the division head simply writing plaintiff a letter telling him he was terminated. Id. at 1440.

In *O'Donnell,* the allegedly discriminatory statements were made by the director of medical affairs of the hospital where plaintiff worked. In fact, plaintiff had been the director's secretary, but she was replaced by a younger woman who testified about statements made by the director and the executive director of the hospital. The court did not go so far as to say this type of hearsay testimony was "direct" evidence of discrimination, but it did find it was properly admitted. *Id.* at 1547–49. The evidence was sufficient to get plaintiff past the defendant's motions for directed verdict and j.n.o.v.

In *Wilson,* a Title VII claim tried to an advisory jury, the court found it was error to exclude a witness' signed statement detailing comments she heard made by the mayor of the defendant city. The comment the witness heard did not mention the plaintiff, but did refer to a black in a derogatory manner. *Id.* at 636. One distinguishing point in *Wilson* is that the statement was allegedly made by the mayor of

the defendant city—a person who had spoken with the plaintiff at an informal job interview. *Id.* at 633. The appeals court reviewed the case as if no jury had been present. No effort was made by the trial court to comment on the credibility of the witness when her testimony (which was also not admitted) differed from the written statement. *Id.* at 636–37.

With only a few exceptions, all of the plaintiffs and plaintiffs' witnesses testified to some extent about disparaging age related remarks made by Tony Martin. Defendant does not quarrel with whether Martin actually made such statements and the Court must take such statements as having been said in addressing the instant motion for j.n.o.v. Without going into detail as to the testimony concerning Martin's statements, the following should suffice to demonstrate the types of remarks which are at issue. At one of the first meetings called by Tony Martin upon his arrival at the Sarasota plant (held in what is known as the "War Room"), defendant concedes that "Martin made a statement [or statements] to the effect that he noticed a lot of 'old guard' or 'old faces' or 'he would like to see new blood or new ideas.'" (Defendant's proposed findings of fact-liability at 7, par. 28). (Defendant also concedes that at another staff meeting, Martin used the terms "old bastards" or "old farts." *Id.* at 7, par. 29).

The remarks attributable to Kent Morgan were revealed by the deposition testimony of Robert Klessig, a Regional Sales Manager for Sangamo Weston in Los Angeles, California who was terminated on June 8, 1979 (the same time as the eight plaintiffs who were terminated in the r.i.f.). In his deposition Klessig recounted the events leading up to *his* termination (he was *not* a plaintiff to the instant case) and testified that Kent Morgan said that they were going to have some layoffs and "Unfortunately you're going to be one of those laid off." Klessig also testified that Morgan said, "Bob, you've been with the company a long time. You're too old to go

any further. It's my policy that I'm going to make room for the younger men."

As to Tony Martin, plaintiffs contend that his decision to direct the r.i.f. at Morgan's Data Systems Department, which "was heavily populated by older employees, including seven of the ten plaintiffs in this case," and other factors would allow an inference that Martin "effectively implemented a discriminatory plan to weed older, senior employees out of middle management by targeting a department populated by such individuals to bear the brunt of the layoff." (Plaintiffs' brief in support of final judgment against defendant at 14–15). The essence of the plaintiffs' argument and the extent to which they seek to draw inferences that Kent Morgan had a discriminatory motive can be seen by the following argument taken from their brief:

> The plaintiffs also introduced substantial evidence from which the jury could have inferred that Mr. Martin's close associate, Mr. Morgan, was strongly influenced by the General Manager in his selection of employees for the reduction in force. For example, there was testimony that the General Manager actively participated in numerous discussions, which took place during staff meetings, where candidates for the RIF were discussed. Witnesses recalled the General Manager suggesting that certain employees over the age of forty be fired. From these facts, the jury could have inferred that Mr. Morgan was guided in the selection process by his boss, the General Manager, and was acting in accordance with the General Manager's oft-stated discriminatory views in selecting fifteen over–40 senior employees for the layoff.

*Id.* at 15. Such evidence and inferences are in addition to the allegedly "direct" evidence of discrimination which plaintiffs see as being the age related statements by Martin and Morgan.

■ Despite the lenient standard held by the Eleventh Circuit as to what might be considered "direct" or "substantial" evidence of discrimination to merit imposing a stricter burden of proof on a defendant than that imposed by under the *McDonnell Douglas* test, this Court finds that the statements made by Tony Martin and Kent Morgan cannot be considered direct or substantial evidence of discrimination under the circumstances of this action. First, although Martin and Morgan were admittedly in positions of authority within the Sangamo Weston organization, they did not have the complete authority to terminate the number of employees terminated in the r.i.f. without approval from upper level management. The record shows that Morgan, at Martin's request, compiled a list of employee's names in his (Morgan's) department. Morgan was solely responsible for whose name went on the list and testified that he was not influenced by Martin in any way. The list then went to Martin who then sent the list to Sangamo Weston's headquarters in Atlanta, Georgia. There the list was reviewed and approved by upper level management. Without this approval from above, no reduction-in-force could have taken place. In fact, before final approval was given the list was sent back to Martin from Atlanta with orders to cut back on the number of employees to be terminated, according to Jimmy Lee, who was at the time Executive Vice President of Sangamo Weston. Second, the statements made by Martin and Morgan were never tied to the termination of any of the plaintiffs involved in the r.i.f. No connection was shown between the discriminatory remarks and the plaintiffs' terminations. *See Pace v. Southern Railway System,* 701 F.2d 1383 at 1388 (11th Cir.1983) (plaintiffs must show "the nexus between [their] demotion [or termination] and age discrimination.").

■ Age related remarks can be probative of age discrimination only if they are connected with the adverse action taken against a particular plaintiff. For there to be a nexus between comments made by a manager or supervisor and some adverse employment action taken against a plaintiff, such comments or statements must be shown to have come from someone directly responsible for a plaintiff's termination.

Comments or statements from one individual in a chain of command within an organization are insufficient to give rise to an inference of age discrimination, let alone to provide sufficient proof as to the motivation or intent of those responsible for the plaintiff's termination. *Haskell v. Kaman Corp.*, 743 F.2d 113 (2d Cir.1984); *McLaurin v. Fisher*, 768 F.2d 98 (6th Cir.1985); *La Montagne v. American Convenience Products, Inc.*, 750 F.2d 1405 (7th Cir. 1984); *Stedenbach v. CPC International Inc.*, 691 F.2d 735 (5th Cir.1982); *cert. denied*, 461 U.S. 944, 103 S.Ct. 2122, 77 L.Ed.2d 1302 (1983); *Elliott v. Group Medical & Surgical Service*, 714 F.2d 556 (5th Cir.1983), *cert. denied*, 467 U.S. 1215, 104 S.Ct. 2658, 81 L.Ed.2d 364 (1984); 21 F.2d 2819; *Simmons v. McGuffey Nursing Home, Inc.*, 619 F.2d 369 (5th Cir.1980); *Graefenhain v. Pabst Brewing Co.*, 620 F.Supp. 696 (E.D.Wis.1985); *Williamson v. Owens-Illinois, Inc.*, 589 F.Supp. 1051 (N.D.Ohio 1984); *Everett v. Comstat*, 33 Fair Empl.Prac.Cases 793 (D.D.C.1983).

Accordingly, for the above reasons, the Court finds that the statements made by Tony Martin and Kent Morgan cannot be considered as direct evidence of discrimination. They are simply circumstantial evidence and no more.

Because the Court has determined that Martin and Morgan's remarks are not direct evidence, the defendant's burden remains one of production. The defendant has produced evidence that the reduction-in-force was based on legitimate business reasons which were not related to age. (Defendant's Brief on liability at 6). Plaintiffs are therefore required to prove the ultimate issue that age was a determining factor in their discharges. The Court now turns to the individual plaintiffs terminated in the r.i.f. to determine whether there is sufficient evidence to support the jury's verdicts.

As initial observations that apply to all the plaintiffs terminated in the reduction-in-force, the Court notes the following. Plaintiffs Bass, Breyton, Fearn, Gregory, Norton, Papastrat, Ridgewell, and Woodworth "were all qualified for their positions at the time of their terminations." (Defendant's brief on liability at 3). Also, the defendant concedes the plaintiffs made out a prima facie case (although questionable in this Court's opinion) and the reduction-in-force which occurred in June, 1979, was initially discussed in January, 1979. (Filing 203, T16:3–9). These discussions took place at staff meetings which were attended by department or division managers and supervisory personnel.

At some point in late 1978 or early 1979, Sangamo Weston made a business decision to cut expenses due to losses and declining revenue in various areas. The decision was implemented by the plant manager Tony Martin who reduced the operating budgets of Data Systems (directed by Kent Morgan) and Engineering (directed by Charles Gilmore). In response to the budget reductions, Morgan and Gilmore reduced expenses and compiled a list of employees to be terminated within their respective departments. Although Martin determined the decrease in Morgan's and Gilmore's departmental budgets, Martin relied on Morgan and Gilmore to determine how they would meet their respective budgets. Both Morgan and Gilmore recommended employees from their departments for termination in order to meet their decreased budgets. However, only the terminated employees within Kent Morgan's Data Systems division (plaintiffs Bass, Breyton, Fearn, Gregory, Papastrat, and Woodworth) brought age discrimination actions.

In order to meet his reduced budget, Kent Morgan reorganized the Data Systems division. Morgan reduced the number of departments within his division from six to five, consolidating or eliminating various jobs, and terminating 37 employees. Of the 37 employees terminated by Morgan in the r.i.f., 18 were under 40 years old and 19 were over 40 years old. The average age of the employees in the Data Systems Division immediately before and after the r.i.f. was approximately 41, while the average age of the employees at the Sarasota plant immediately before and after the r.i.f.

was approximately 40. Neither Richard Ridgewell nor the other seven r.i.f. plaintiffs were replaced after they were terminated. Duties or positions were either eliminated or consolidated with existing positions.

### a. *Shelby Bass.*

Before his termination, Shelby Bass was Director of Product Marketing. Bass reported directly to Kent Morgan who was at that time the Director of Data Systems which was made up of six separate departments or divisions like the one headed by Shelby Bass.

The only age related comment which Bass could recall Tony Martin making occurred at the first meeting called by Martin, and attended by most department managers and supervisors. Bass testified that Martin commented that he was surprised at the number of older people in Sarasota and the number of older people in the plant. Bass could not recall the exact context of Martin's remark, but it was his impression that Martin's remarks were directed to the people at the Sarasota plant. There were no other specific remarks referring to "old" or "older" employees, as Bass recalled, and Bass admitted that he does not rely on any oral or general statements made by Martin to support his age discrimination claim.

In reorganizing the Product Marketing Department, of which Bass was director, Morgan eliminated Bass' position and divided his duties between two other employees over 40. The organizational charts depicting the Data Systems Division before and after the reduction-in-force (Exhibits 56 and 57) reveal the changes made. These are not just surface changes. Major changes were made by Morgan in an attempt to meet his division's reduced budget. Although Bass was qualified and had not received a bad performance evaluation, his job was one which Morgan found necessary to eliminate.

The defendant established sound business reasons for the r.i.f. and Morgan testified as to his method and reasons for the reorganization of his Data Systems Division. Bass' attempt to create an inference that his termination was motivated by his age fails. The Court finds that the statements made by Martin and Morgan are insufficient to prove that Bass' termination was based on age. Plaintiffs have simply failed to establish a pattern or practice of age discrimination, which was the cornerstone on which all the plaintiffs built their cases. Furthermore, the Court finds that Bass' testimony and all other testimony favorable to him is insufficient to support the jury's finding that his age was a determinative factor in his termination. Therefore, the defendant's motion for j.n. o.v. as to plaintiff Shelby Bass, Jr. must be sustained.

### b. *Gerard Breyton.*

At the time he was terminated, Breyton was Director of International Operations reporting directly to Kent Morgan. Plaintiff Chris Papastrat worked in Breyton's department. Breyton had worked for Sangamo Weston or its predecessors from February, 1965, until his termination in June, 1979.

Like other plaintiffs and witnesses, Breyton testified about the "War Room meeting," which took place sometime in the Fall of 1978 or early 1979. According to Breyton, Tony Martin spoke at the meeting, which was attended by at least 30 people, and said words to the effect: "... as I look around the room I see many 'old folks' and I want some 'younger blood.' I am in my 'younger 40's' and I don't want managers reporting to me who are older than I am." Like all plaintiffs, Breyton's success hinged on the establishment of a pattern or practice of discrimination. There is no evidence in the record to link Breyton's termination to his age. Breyton did not testify that Morgan made any age related remarks to him. Rather, Breyton relied upon Martin's remarks to show that age was a determining factor in his discharge. The Court has already indicated that the remarks of Martin and Morgan are insufficient to establish

a pattern or practice of age discrimination within Sangamo Weston.

The International Operations Department which Breyton managed was completely reorganized by Kent Morgan for what was shown to be legitimate business reasons. The department, as well as Breyton's position, was eliminated. Breyton's duties were consolidated and assumed by people within the new Sales Department. Breyton failed to show that Martin's remarks had any effect on Morgan's reorganization of International Operations. Accordingly, the Court finds that Breyton's testimony and all other evidence favorable to him is insufficient to support the jury's finding that his age was a determining factor in his termination. The defendant's motion for j.n.o.v. must therefore be sustained.

c. *Edward Fearn.*

Fearn worked for the defendant from September, 1976 until his termination in June, 1979, at age 43. At the time of his termination, Fearn was a Senior Applications Engineer in the "Weather Data" department which was a part of the Product Marketing Division (headed by Shelby Bass). Fearn testified that he had three years of upper level education beyond high school, but apparently did not receive a college degree. His performance at Sangamo Weston was not a factor in his discharge and like most plaintiffs he testified that he never received a bad evaluation.

One of the defendant's reasons for the reduction-in-force was that Sangamo Weston went out of the weather business. As a result, Morgan testified, Fearn was eliminated due to the decrease in the weather business and because Fearn's experience was almost entirely limited to weather. There was some evidence presented by plaintiffs which, when all doubts are resolved in their favor, hinted that Sangamo Weston had not gotten out of the weather business entirely. However, the Court finds that plaintiffs' evidence is insufficient to cast doubt on the defendant's claim that the weather department was for all prac-

tical purposes eliminated. Several witnesses, including some plaintiffs, testified that there was no additional research and development and no active marketing in the weather business after the reduction-in-force. Additionally, Kent Morgan indicated that what little remained of the weather business after the reorganization was limited mainly to honoring previously made contracts, servicing existing contracts, and unloading inventory.

Like the other plaintiffs terminated in the reduction-in-force, the success of Fearn's case depended upon the establishment of a pattern or practice of discrimination. All of the evidence viewed in the light most favorable to Fearn is insufficient to support the jury's finding that his age was a determining factor in his termination. Fearn had worked for Sangamo Weston for only 2½ years and was hired, according to him, due to his expertise in weather related products. The elimination (or near elimination) of the weather business by Sangamo Weston was a legitimate business reason for Fearn's termination. Accordingly, the Court finds that Fearn has failed to provide sufficient evidence to support the jury's finding that his discharge was due to his age. Therefore, the defendant's motion for j.n.o.v. as to plaintiff Edward Fearn must be sustained.

d. *James Gregory and Donald Woodworth.*

Both Gregory and Woodworth worked in the Systems Department which was managed by J.R. Altenbernd. Altenbernd reported directly to Kent Morgan during the relevant time period. Gregory was 48 and Woodworth was 43 at the time of their terminations in June, 1979. Gregory held the position of Senior Engineer in the Systems Department and Woodworth held the position of Principal Engineer in the Systems Department. Neither Gregory nor Woodworth received a less than satisfactory evaluation while at Sangamo Weston.

Kent Morgan testified that the number of employees in the Systems area was reduced because work in that area was down

by two-thirds of what had been budgeted. A total of nine employees from Systems were terminated. Of these nine, four (including Gregory and Woodworth) were over 40 and five under 40. (Defendant's exhibit 56). At Morgan's direction, the Systems Manager, J.R. Altenbernd, gave each employee in his department a relative rating and ranked them from "top performers to bottom performers" in a "totempole arrangement." Gregory and Woodworth were on the bottom half of the list as were the seven other people in Altenbernd's department who were also terminated in the reduction-in-force. Two engineers in their twenties (Dowdy and Naylor) who were assigned to work with Gregory were also a part of the r.i.f. According to Morgan, neither Gregory nor Woodworth were replaced by outsiders. Both Gregory and Woodworth were selected by Kent Morgan for the reasons previously mentioned.

Gregory and Woodworth stand apart from the other plaintiffs who were terminated in the r.i.f. because of the way they were chosen. Morgan directed their supervisor to rank all employees in his department, apparently to assist Morgan in making the difficult decision of who to terminate. From this list, Morgan chose Gregory and Woodworth because they ranked in the bottom half. Although Woodworth disagreed that the defendant's reasons for the r.i.f. were economic, he admitted that he had no knowledge about the economic conditions of the department. Woodworth also testified that he never heard any discriminatory remarks from a long list of people in upper level management, including Kent Morgan. Plaintiffs Gregory and Woodworth failed to establish a pattern or practice of discrimination within Sangamo Weston. Their testimony and all other relevant evidence viewed in the light most favorable to them is insufficient to support the jury's finding that their ages were a determining factor in their respective terminations. The defendant's motion for j.n. o.v. must therefore be sustained as to plaintiffs James Gregory and Donald Woodworth.

e. *John Norton.*

Norton worked for the defendant or its predecessors from 1961 until his termination on June 7, 1979, at age 57. At the time he was terminated, Norton was working as an Application Engineer in the Data Acquisition area, which was a part of the Product Marketing Department. Norton received his engineering education while in the U.S. Army, but apparently never attained a degree. According to Norton, his evaluations were average or above average, but Kent Morgan prodded him to do better.

The Data Acquisition area was made up of Norton and Robert Vorce (age 50), and was managed by Stuart Ulfers. According to Ulfers, the Data Acquisition area was essentially eliminated after the reduction-in-force and the reorganization. Existing data acquisition products continued to be sold after the r.i.f., but research and development in that area was cancelled. No one was brought in to assume Norton's position. Ulfers also testified about the skills of Norton and Vorce. According to Ulfers, Vorce had higher academic credentials than Norton and was an expert in "FM" while Norton's strongest areas were small systems work and non-computerized systems. Although items within Norton's strong areas continued to be produced, research and development in those areas was cancelled. A number of the products with which Vorce was involved continued to be marketed after the r.i.f.

Norton testified that he never personally heard any age related remarks by Tony Martin or other managers. Like all of the other plaintiffs, his case depended upon the establishment of a pattern or practice of discrimination. The reasons for implementing the r.i.f. and the reasons behind the selection of John Norton were not shown to be pretext. Considering all of the evidence in the light most favorable to Norton, the Court finds that the evidence is insufficient to support the jury's verdict that Norton's age was a determining factor in his discharge. Norton presented no evidence to cast doubt on the defendant's rea-

sons behind the reduction-in-force and the reasons behind his own termination. Therefore, the defendant's motion for j.n. o.v. must be granted as to the plaintiff John Norton.

### f. *Chris Papastrat.*

Papastrat worked for the defendant or its predecessors from 1963 until his termination on June 7, 1979 at age 41. At the time he was terminated, Papastrat was Regional Export Manager for North and South America. He worked within the International Operations Division which was headed by Gerard Breyton. Of the three people who worked in International Operations (Breyton, age 50 when r.i.f. took place, Papastrat (41), and Thurmond (45)), only Thurmond was not terminated.

Morgan's reorganization of the Data Systems Division involved the complete elimination of the International Operations Department. The International Operations area essentially became the "Export Sales" unit, a part of the Sales Department, with Thurmond as manager. According to Morgan, Papastrat's position was eliminated and his duties were assumed by one person who took on additional countries in the Middle East and Africa and who could operate independently. This person, H. Durrett, was also over 40. Morgan was solely responsible for choosing Papastrat for termination and testified that his performance was not producing enough business to support him. According to Papastrat, Morgan told him that his performance was not the reason for his termination.

Papastrat testified as to age related remarks made by Tony Martin at the "War Room" meeting. However, Papastrat admitted that he had no personal knowledge that Tony Martin had anything to do with his termination. As previously discussed, these remarks do not provide direct evidence of age discrimination against any of the plaintiffs. With particular regard to Papastrat, the Court notes that he admitted the age related remarks were not connected with his termination.

Papastrat's testimony and all other evidence viewed in the light most favorable to him is insufficient to support the jury's finding that age was a determining factor in his termination. Like Breyton and the other plaintiffs, Papastrat failed to present any evidence that would indicate his discharge was motivated by his age. Therefore, the defendant's motion for j.n.o.v. must be sustained as to plaintiff Chris Papastrat.

### g. *Richard Ridgewell.*

Ridgewell was selected for termination by Roy Fenner, who worked for Solartron Instruments, a British company that used Sangamo Weston's facilities, according to Fenner. Fenner was transferred from England to Sarasota in 1976 to check out the market for a specialized electronic product called a "Frequency Response Analyzer", manufactured by Solartron. Fenner has operated in California for the past seven years.

Fenner testified that he hired Ridgewell, that Ridgewell's paychecks came from EMR (Sangamo Weston's predecessor), and that EMR was then reimbursed by Solartron by a voucher system. This was necessary according to Fenner, because Solartron was not incorporated in the United States and Sangamo Weston administered the paperwork, paid benefits, etc. Fenner also testified that he discharged Ridgewell out of necessity, because Solartron had decided to move to California and sell only Solartron products. Thus, Ridgewell was no longer needed at Sarasota and his position was eliminated.

Ridgewell testified about some age related remarks made by Tony Martin, however, these remarks were not directed toward Ridgewell and are not probative of any age discrimination on the part of Martin, Fenner, or Morgan. There is a major dispute as to whether Ridgewell worked for Sangamo Weston or Solartron. According to Ridgewell, he had no idea what relationship Solartron had with his salary, and from 1978 onward Ridgewell believes that he had no supervisor. Ridgewell testified that

the only connections he had with Fenner were that Fenner signed his salary increase (on Sangamo Weston's letterhead) and Fenner was present with Oti Rioux Wooster, Personnel Director, on the day Mrs. Wooster told Ridgewell he was being forced to resign. Other than the remarks made by Tony Martin, Ridgewell admitted that he did not know of any discriminatory remarks made by Fenner or any of the officers or directors of Schlumberger or the defendant.

For purposes of the instant motion for j.n.o.v., Ridgewell will be considered as having worked for Sangamo Weston. *See* footnote 5. Even assuming that Ridgewell did work for Sangamo Weston and Oti Rioux Wooster informed him he was being terminated, the Court finds that there is not even a scintilla of evidence to suggest that his age was a determining factor in his termination. Like all the other plaintiffs, Ridgewell's case was dependent upon the establishment of a pattern or practice of discrimination within Sangamo Weston. When this theory failed, the plaintiffs' cases had no legs on which to stand. Ridgewell failed to adequately rebut the defendant's nondiscriminatory reasons for his termination, and ultimately failed to produce sufficient evidence to prove by a preponderance of the evidence that his age was a determining factor in his discharge. Therefore, the defendant's motion for j.n. o.v. as to Richard Ridgewell must be sustained.

## III. CONCLUSION.

In sum, as to the reduction-in-force plaintiffs, the Court finds that none of those plaintiffs (Bass, Breyton, Fearn, Gregory, Norton, Papastrat, Ridgewell, or Woodworth) have presented sufficient evidence to support the jury's findings that their ages were determining factors in their respective terminations. Accordingly, after judgments have been entered in favor of the plaintiffs, in accordance with the Court's previous discussion, *see* Section II, pp. 255–62, *infra*, the Court will enter a separate order and judgment granting the defendant's motion for judgment notwithstanding the verdict as to each of the eight reduction-in-force plaintiffs.

As to plaintiffs Charles Castle and Harry Moore, judgments will be entered in their favor in accordance with the Court's previous discussion and findings, *see* Section II, pp. 255–62, *infra*. The Court will then enter a separate order and judgment granting the defendant's motion for judgment notwithstanding the verdict as to Castle and Moore. All actions as to all plaintiffs will be dismissed.

The foregoing constitutes the Court's findings of fact and conclusions of law, relating to the issues tried to the Court, pursuant to Fed.R.Civ.P. 52.

APPENDIX

FIGURE 1

FRONT PAY DAMAGES

| NAME | LIQUIDATED DAMAGES [1] | Alternatives Proposed by Plaintiffs [2] | | | Alternatives Proposed by Defendant | LOST PENSION DAMAGES [3] |
|---|---|---|---|---|---|---|
| | | A | B | C | | |
| Bass | $181,541 | $23,297 | $17,615 | $13,652 | $ –0– | $ –0– |
| Breyton | 17,094 | –0– | –0– | –0– | –0– | 88,626 |
| Castle | –0– | 1,193 | –0– | –0– | –0– | 53,462 |
| Fearn | 138,476 | 185,018 | 140,054 | 124,145 | 19,875 | 38,749 |
| Gregory | 137,768 | 143,388 | 129,789 | 116,935 | 27,045 | 45,712 |
| Moore | 34,972 | –0– | –0– | –0– | –0– | 57,075 |

### FIGURE 1
### FRONT PAY DAMAGES

| NAME | LIQUIDATED DAMAGES [1] | Alternatives Proposed by Plaintiffs [2] | | | Alternatives Proposed by Defendant | LOST PENSION DAMAGES [3] |
|---|---|---|---|---|---|---|
| | | A | B | C | | |
| Norton | $ 74,061 | $36,992 | $34,614 | $31,297 | $ –0– | $27,935 |
| Papastrat | 22,375 | 19,968 | 4,594 | 954 | –0– | 73,553 |
| Ridgewell | 164,259 | 27,400 | 23,669 | 19,059 | 21,024 | 38,547 |
| Woodworth | 879 | –0– | –0– | –0– | –0– | 50,781 |

NOTES: A "–0–" indicates that comparability has been reached by a particular plaintiff.

1. These figures are equal to the jury's back pay award. 29 U.S.C. Section 626; *Babb v. Sun Co., Inc.*, 562 F.Supp. 491 (D.Minn.1983); *Berndt v. Kaiser Aluminum & Chemical Sales, Inc.*, 604 F.Supp. 962 (E.D.Pa.1985), *aff'd*, 789 F.2d 253 (3rd Cir.1986).

2. Alternative A includes lost wages, social security, profit sharing, insurance benefits, and the value of vacation time.

 Alternative B omits the value of vacation time.

 Alternative C omits the value of vacation time and insurance benefits.

3. Plaintiffs contend they are entitled to damages for lost pension benefits *in addition to* any award for front pay. These figures are separate and apart from the plaintiffs' proposed alternatives for front pay damages. Defendant does not make a separate award for lost pension benefits.