786 F.2d 1537
 40 Fair Empl.Prac.Cas. 998,
40 Empl. Prac. Dec. P 36,110
John H. LEWIS, Plaintiff-Appellant,
v.
FEDERAL PRISON INDUSTRIES, INC., a corporation chartered
under the laws of the United States, Defendant-Appellee.
 Nos. 85-3070, 85-3353.
 United States Court of Appeals,
Eleventh Circuit.
 April 22, 1986.
 
 Terrence T. Dariotis, Kahn & Dariotis, M. Stephen Turner, Culpepper, Turner & Mannheimer, Tallahassee, Fla., for plaintiff-appellant.
 Kenneth W. Sukhia, Asst. U.S. Atty., Tallahassee, Fla., for defendant-appellee.
 Appeals from the United States District Court for the Northern District of Florida.
 Before JOHNSON and ANDERSON, Circuit Judges, and DYER, Senior Circuit Judge.
 ANDERSON, Circuit Judge:
 
 
 1
 John H. Lewis appeals from a judgment of the district court in favor of his former employer, Federal Prison Industries, Inc. ("FPI"). Lewis alleged that FPI discriminated against him on the basis of age in violation of the Age Discrimination in Employment Act, 29 U.S.C. Sec. 633a. After a nonjury trial, the district court concluded that Lewis had not established a prima facie case of age discrimination. Because the district court made a clearly erroneous finding of fact, we reverse and remand.
 
 I.
 
 2
 John H. Lewis was born January 4, 1932, and was an employee of the federal correctional system for over 25 years.[1] From May 28, 1970 through December 29, 1982, Lewis was employed by FPI at the Federal Correctional Institution at Tallahassee, Florida ("FCI"). FPI is an entity of the Federal Bureau of Prisons which manufactures furniture for use in federal government offices. For the last several years he was employed at FPI, Lewis held the position of woodcrafter assembly foreman.
 
 
 3
 Lewis was one of four woodcrafting foremen at FPI. Each foreman was charged with supervising inmate employees working in their respective areas of the factory. Each of these woodcrafting foremen--the mill foreman, assembly foreman, finishing foreman, and packaging-relief foreman--reported directly to a general foreman. At the times relevant to this cause of action the general foreman was William C. Tidwell.
 
 
 4
 The Superintendent of Industries oversaw the work of the general foreman, as well as the work of two other departments. During the times relevant to this case, the Superintendent position was filled by Douglas Stromberg and, later, Oliver Mincey.
 
 
 5
 The Superintendent of Industries reported to both the Warden of FCI and the FPI factories manager in Washington, D.C. The Warden was Joseph C. Bogan. The FPI factories manager for furniture factories was Scott Graham.
 
 
 6
 Since he had been employed in the federal correctional system for 25 years, Lewis became eligible for early retirement on his 50th birthday, January 4, 1982.[2] Although he was not the oldest of the four woodcrafting foremen at FCI, Lewis had the earliest date of eligibility for retirement because of the length of his service.
 
 
 7
 In September 1981, FPI factories manager Scott Graham interviewed approximately thirty job applicants from the High Point, North Carolina, area for the position of woodcrafter trainee. Of those persons interviewed, Graham considered thirty-four year old Patty Baker the best suited for FPI's needs. Baker had been the only female supervisor at one of the large furniture manufacturing firms in the High Point area. Graham found Baker to be an excellent applicant, but a federal job cutback eliminated the trainee positions for which Graham had conducted the interviews. Because Baker was so highly qualified and because FPI management had emphasized the recruiting of females and minorities from the private sector, Graham identified Baker to the FPI management as a high priority recruit. If Baker was to be hired, it was necessary to get her into the federal system before she reached the age of thirty-five, in July 1982. Graham "transferred" a vacancy from another prison facility to Tallahassee to create a position for Baker. The new position was termed "assistant assembly foreman." In January, while Lewis was on vacation, Baker went to FCI, toured the facility, and was interviewed for the new position. Then, Superintendent Stromberg notified Graham that the FCI administration would like to have Baker work at FCI. Baker was hired and began to work in Tallahassee in April 1982.
 
 
 8
 Although Baker's position was designated assistant assembly foreman, the title did not accurately reflect the position's responsibilities or its place in the chain of command. Baker did not assist the assembly foreman, Lewis, nor did she report to him. Baker was supervised directly by the general foreman, Tidwell, and her responsibilities were primarily to relieve the four woodcrafting foremen and to observe the operation of the factory as a trainee. The four woodcrafting foremen positions were paid at the WS-10 level; the assistant assembly foreman position was established at pay grade WS-6.
 
 
 9
 In the fall of 1981, Tidwell had begun telling Lewis that he was going to be replaced by a woman. Shortly after Lewis became eligible for retirement, the district court found that Tidwell began harassing him in an effort to force his early retirement. The harassment consisted of making Lewis "follow the book to the letter" and causing Lewis to be as uncomfortable as possible at work. Tidwell knew that Lewis could not handle pressure, that Lewis had been under a doctor's care, and that Lewis had been taking valium as prescribed by his physician.
 
 
 10
 The district court found that Lewis was subjected to primarily direct verbal abuse by Tidwell. However, the district court found that the harassment took other forms as well. For example, Lewis was upbraided by Tidwell in the presence of other FPI and FCI employees and in the presence of the inmates he was charged with supervising--a practice forbidden by FPI management. Tidwell watched Lewis very closely, waiting to catch him in some mistake or moment of inactivity. Tidwell also attempted to isolate Lewis from the other employees, e.g., Tidwell advised the other employees not to have anything to do with Lewis in order to avoid trouble for themselves. Tidwell criticized Lewis regarding the quality of his work and his supervision of the inmates for whom he was responsible. Lewis was often told that he was being replaced by Patty Baker and would have to retire so she could assume his position at FCI. Tidwell repeatedly advised Lewis that he should "go ahead and retire."
 
 
 11
 The district court found that Tidwell's harassment intensified in about March 1982. The court found that Tidwell told Lewis that if he was going to remain at FCI, he would not be allowed to sit. Lewis' desk chair was taken away, and his desk was moved into the middle of an open area so he could be easily observed at all times from Tidwell's desk. Tidwell shared a glass enclosed office with the Superintendent of Industries overlooking the work area. Record on Appeal, vol. 8 at 45.
 
 
 12
 Tidwell continued to pressure Lewis to retire. In April 1982, Tidwell informed Lewis that he was being given his last satisfactory performance evaluation, that Baker would soon begin work, and that Lewis should retire before the next rating period expired. The district court found that Tidwell was observed shouting at Lewis in the presence of inmates and others.
 
 
 13
 Shortly after Baker began working at FCI, Superintendent Stromberg retired. Before his retirement, which he took on the first day of his eligibility, Stromberg often discussed retirement with Lewis. The district court found that, while it would not have been unusual for Stromberg to advise another employee to retire "as soon as eligible," he did not tell Lewis that Lewis must retire or that Baker had been hired to replace him. Stromberg testified that Lewis was interested in retirement and discussed retirement with Stromberg as if to evaluate the various options open to him. Stromberg assisted Lewis in computing his retirement pay, and at one point, Stromberg determined that Lewis would lose only the equivalent of $1.37 an hour by retiring. Stromberg testified that he never encouraged, directed, or ordered Lewis to retire. Moreover, he never received complaints from Lewis about the treatment Lewis was receiving from Tidwell, nor did Lewis tell Stromberg that Tidwell was "encouraging" his early retirement.
 
 
 14
 Stromberg was replaced by Oliver Mincey, who took over as Superintendent on May 10, 1982. Two days after Mincey arrived at FCI, Lewis asked to meet with him. The meeting between Lewis and Mincey occurred on May 19, 1982, at which time Lewis related his complaints about the treatment he was receiving from Tidwell. At the meeting, Mincey asked Lewis to provide him with a memorandum describing the problems he was experiencing. Then, Mincey reported to Warden Bogan the fact that Lewis had complained of harassment by Tidwell. The district court found that Bogan directed Mincey to meet with Tidwell and, "to the extent Tidwell was acting improperly, tell him to stop acting improperly." Record on Appeal, vol. 2 at 431. After Lewis submitted the memorandum which Mincey had requested, Mincey took the memorandum to Bogan. After reviewing the memorandum, Bogan decided that the situation could easily be handled by Mincey, and that Lewis was "blowing the situation out of proportion." Id. Bogan instructed Mincey to monitor the situation and keep him informed if further problems arose.
 
 
 15
 The district court found that Mincey then met with Tidwell, as he had been instructed to do, and told Tidwell "to treat Lewis fairly, like everyone else." Id. Shortly afterwards, Mincey met with Lewis and Tidwell at the same time, informing them that he expected them to work together. Mincey told Lewis that he should inform Mincey of any further problems with Tidwell.
 
 
 16
 After Baker arrived, she told Lewis she understood he was leaving soon. Later, when Baker instituted a "flower fund" to which all factory employees contributed for the purpose of paying for flowers to be sent to funerals of employees' relatives, she told Lewis that she didn't think that he should contribute because she had been told that he was not going to be around that long. Mincey testified that on July 2, 1982, "[Baker] was feeling as though she may have had something to do with the way Mr. Lewis was reacting" and "felt responsible somehow." Record on Appeal, vol. 8 at 209. During the same period of time, his coworkers noticed that he was becoming nervous and looked haggard.
 
 
 17
 On June 22 or 23, 1982, Mincey testified he saw Tidwell "shout at Mr. Lewis when it was someone else's time to go out and perform the duty that he requested him." Id. at 208. Tidwell had ordered Lewis out into the rain to perform one of Baker's tasks. Record on Appeal, vol. 2 at 432. Mincey testified that Tidwell told him that "he had to treat Mr. Lewis this way because he was a child." Record on Appeal, vol. 8 at 208. Mincey stated that he told Tidwell that he had not handled himself professionally and that it was "no way for him to talk to any of his employees." Id. at 154.
 
 
 18
 In July 1982, Tidwell charged Lewis with criminal activity in connection with Lewis' allegedly having assisted an inmate in fraudulently obtaining early parole. Plaintiff denied the allegation. The charges were investigated by the FCI administration, primarily John L. Clark, one of the two associate wardens. No charges were brought against Lewis. The district court found that the primary reason for charges not being brought was that the investigation revealed that Tidwell had made at least one false statement regarding the allegations. The Warden did not have enough evidence to sustain an action against Lewis or against Tidwell for making the false statement. During the course of the investigation, Lewis described to Associate Warden Clark the harassment he had been subjected to by Tidwell, and on July 12, 1982 submitted a written memo to Associate Warden Clark detailing his charges. However, Clark did not investigate Lewis' charges that he was being forced out. Record on Appeal, vol. 9 at 136. Lewis testified that he related the contents of his July 12, 1982 memo to Associate Warden Southerland in the presence of Superintendent Mincey. Warden Bogan testified that he personally reviewed Lewis' July 12, 1982 memorandum. Record on Appeal, vol. 8 at 98. However, he did not investigate or order an investigation of the charges. He did discuss the memo with Mincey and asked Mincey to continue to monitor the situation. Id. at 47-48.
 
 
 19
 In July and August, 1982, the harassment continued. The district court found that Lewis was "counseled" and "written up" by Tidwell regarding production problems. Lewis testified that he believed he was not at fault in these situations, and another foreman testified that Tidwell was blaming Lewis for problems caused by other employees. Record on Appeal, vol. 6 at 76.
 
 
 20
 Lewis testified that on July 29, 1982, he asked Superintendent Mincey to help him with an EEOC filing. Lewis did file a Notice of Intent to Sue for discriminatory harassment based on age with the EEOC on September 13, 1982. This notice was received by the EEOC on September 17, 1982. Record on Appeal, vol. 1 at 55. However, the EEOC did not have a record of the notice and did not inform the employer. Id. at 39-40. Lewis was never contacted about the complaint. Record on Appeal, vol. 7 at 43.
 
 
 21
 Because he felt himself getting sick, Lewis went to his doctor, Dr. Henry, in August 1982. Dr. Henry prescribed medication for Lewis' nerves and ordered him to take a week off from work. Lewis returned to work on August 23, 1982. He submitted a certificate from Dr. Henry to Superintendent Mincey, stating that Lewis had "Acute Agitated Depression." Plaintiff's Exhibit 11.
 
 
 22
 Warden Bogan met with Tidwell on August 12, 1982 to express his anger over Tidwell's false statement to Associate Warden Clark during the July investigation. Warden Bogan testified that he knew there was a serious problem between Lewis and Tidwell at that time. Record on Appeal, vol. 8 at 105-06. On the same day Mincey and Tidwell went to a local lounge after working hours and discussed the problem. Mincey instructed Tidwell that, if Tidwell had any problems with Lewis, he should consult with Mincey before taking any action against Lewis. Mincey testified that he did not have another meeting with Tidwell after the August 12 meeting in the local lounge. Id. at 170-71.
 
 
 23
 On October 4, 1982, a six-month progress review was given to Lewis. The purpose of a progress review was to notify an employee of any problems and to give him time to correct any problems before the annual evaluation. The district court noted that the evaluation was a poor one. The progress review had been submitted to Superintendent Mincey before it was given to Lewis. Record on Appeal, vol. 8 at 164. The district court noted that Lewis testified that when he questioned the evaluation, Tidwell responded by telling him " '[w]e gave you good advice--you should have gone on and retired. You dug your own hole; we're going to throw the dirt in on top of you.' " Record on Appeal, vol. 2 at 433.
 
 
 24
 October 4 was Lewis' last day on the job. The next day he went to his doctor's office. Dr. Henry placed Lewis on sick leave immediately. Moreover, the district court found that Dr. Henry was "very insistent that Lewis not return to work, although plaintiff testified he wanted to go back." Record on Appeal, vol. 2 at 433. While Lewis was on sick leave, Superintendent Mincey called him at home twice to inquire whether he was returning to work or retiring, because Mincey needed to know whether to fill Lewis' position permanently. On December 29, 1982, Lewis went to FCI and applied for retirement. Lewis was accompanied by his attorneys and informed the prison administration that he considered his retirement "forced" by on-the-job harassment based on his age and that he intended to sue for age discrimination.
 
 
 25
 On January 5, 1983, Warden Bogan sent Lewis' attorney a letter which stated that Lewis need not retire and was free to work at FCI. However, the district court found that Lewis' doctor refused to allow Lewis to return to work at FCI, "opining that Lewis could do nothing worse for his health." Id.
 
 
 26
 On January 24, 1983, Lewis instituted the present action in district court. On April 14, 1983, Lewis' job was filled by James W. Smith, who was 52 years old at the time and had until then been the relief-packaging foreman. Patty Baker, who took over the running of the assembly department from the time Lewis went on sick leave until April 1983, was promoted to packaging-relief foreman, a WS-10 position, to replace Mr. Smith.
 
 II.
 
 27
 The district court noted that a plaintiff may make out a prima facie case of age discrimination under McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), by showing: (1) that he is a member of the protected group; (2) that adverse employment action was taken against him, e.g., discharge, demotion, failure to hire; (3) that he was replaced by a person outside the protected group; and (4) that he was qualified for the position for which he was rejected.[3] The district court found, and we agree, that Lewis has satisfied the first, third and fourth prongs of the McDonnell-Douglas test. With respect to the second prong, i.e., that no adverse employment action had been taken against him, the district court found that Lewis' evidence of constructive discharge would have been sufficient to satisfy the second prong, except that FPI could not be held liable for the actions of its supervisory employee Tidwell.[4] In this regard, the district court applied the standard articulated in Henson v. City of Dundee, 682 F.2d 897 (11th Cir.1982):
 
 
 28
 [w]here, as here, the plaintiff seeks to hold the employer responsible for the hostile environment created by the plaintiff's supervisor or coworker, [he] must show that the employer knew or should have known of the harassment in question and failed to take prompt remedial action.
 
 
 29
 Henson v. City of Dundee, 682 F.2d at 905 (footnote omitted). The district court found that Lewis had proved that the responsible management of FPI, i.e., Superintendent Mincey and Warden Bogan, were aware of the discriminatory treatment of Lewis by Tidwell. Thus, the district court found that Lewis had proved the first step of the test set out in Henson. However, the district court found that, although the remedial action taken by FPI was not effective in fact, Lewis had failed to prove that the responsible management of FPI "knew or should have known" that the remedial action was ineffective. All of the findings of the district court are amply supported in the record, except the last mentioned finding. For the reasons that follow, we conclude that the district judge was clearly erroneous in finding that the responsible management of FPI, i.e., Superintendent Mincey and Warden Bogan, neither knew nor should have known that the remedial action was insufficient.[5]
 
 
 30
 We will focus on what was known or should have been known to Superintendent Mincey and Warden Bogan.[6] The Warden was the chief executive officer at FCI and was responsible for the overall operation of the facility. Record on Appeal, vol. 8 at 6. The Warden had the final authority on personnel matters at the facility: he was responsible for hiring, discipline, resolution of grievances, and firing. Id. at 12.[7] However, Warden Bogan made infrequent visits to the furniture factory. Record on Appeal, vol. 7 at 39. The Superintendent of Industries, one of the Warden's three assistants, managed the whole industrial operation within the FCI, Record on Appeal, vol. 8 at 155 and vol. 9 at 4, and was responsible for the day-to-day operation of the FPI. The Superintendent--first Stromberg and then Mincey--had his office in the factory and made at least one tour daily of the factory. He met with the Warden to discuss the FPI operation once a week. Record on Appeal, vol. 8 at 137 and vol. 9 at 4. The Superintendent, the highest official of FPI at the facility, also reported to FPI administration in Washington. For example, the district court found that Superintendent Stromberg was the one who informed FPI administration in Washington that the FCI administration in Tallahassee wished to hire Baker. Regarding the problem between Lewis and Tidwell, Warden Bogan instructed Mincey to monitor the situation and inform him if there were any further problems. Record on Appeal, vol. 8 at 27. We conclude that both Mincey and Bogan were clearly part of the "higher management" referred to in Henson. 682 F.2d at 905. Both were actively involved in the matters relating to Lewis' problems. As demonstrated below, both Mincey and the Warden knew or should have known of the age discrimination being perpetrated by Tidwell, and both knew or should have known that the remedial action to eliminate the age discrimination was ineffective. Both were acting well within the scope of their actual or apparent authority in dealing with this personnel problem.
 
 III.
 
 31
 Several pieces of evidence clearly indicate that both Mincey and Warden Bogan knew or should have known that the remedial action was ineffective.[8] The first incident that put the FPI administration on notice of the continuing problem was the June 22 occasion when Tidwell sent Lewis out into the rain to perform one of Baker's tasks, so that she wouldn't get wet. The district court did find that this had occurred, but did not note that Mincey had observed it. Record on Appeal, vol. 2 at 432. In fact, Mincey had seen Tidwell order Lewis to do Baker's work and had heard Tidwell say that Lewis had to be yelled at because "he was a child." Record on Appeal, vol. 8 at 208. In the district court's opinion, in the sentence following the description of this incident, rather than noting that Mincey had observed Tidwell's treatment of Lewis, the district court stated, "In marked contrast to Mincey's testimony, Lewis testified he continued to tell Mincey of his problems with Tidwell at every opportunity." Id. While the district court obviously discredited Lewis' testimony that he continued to inform Mincey of the harassment, even in the absence of such discredited testimony, the June 22 incident should have put Mincey on notice that his discussion with Tidwell had been ineffective in curbing Tidwell's mistreatment of Lewis.
 
 
 32
 Another incident, though less important, indicates that Mincey knew that Lewis was still unhappy with his situation. As noted above, Mincey testified that on July 12, Baker had indicated to him that Lewis was feeling badly and that she "felt responsible somehow." Record on Appeal, vol. 8 at 209. The district court did not note this incident in its findings of fact. However, Mincey's testimony makes two things clear: (1) that Mincey had received indications that Lewis remained unhappy with his treatment; and (2) that Baker, who Lewis and Tidwell testified was hired to replace Lewis, felt that she was responsible.[9]
 
 
 33
 Most significantly, however, Lewis' July 12, 1982 memorandum to Associate Warden Clark clearly put the administration on notice that Tidwell was continuing to harass him. Warden Bogan testified that he had personally reviewed this memorandum. Moreover, Lewis testified that he related the contents of this memorandum to the other associate warden and Superintendent Mincey, and the Warden testified that he discussed it with Mincey. Thus, the Warden and all three of his assistant administrators knew the contents of the July 12 memorandum, which described various instances of continued harassment. However, no one investigated the charges that Lewis made.[10] Because it had received this memorandum, there can be no question but that the responsible management of FPI was on notice that the remedial steps it had taken in May had been ineffective. This crucial memo was not discussed by the district court.
 
 
 34
 Moreover, it is clear from the Warden's testimony that the Warden "knew of the problems between [Lewis] and Mr. Tidwell" in July, Record on Appeal, vol. 8 at 100, and that the Warden knew that Lewis did not "believe the problem [had been] solved." Id. at 101. In addition, it is clear that when the Warden had a meeting with Tidwell on August 12, 1982, he "knew there was a serious problem between Mr. Lewis and Mr. Tidwell." Id. at 105.[11]
 
 
 35
 Another incident which should have put FPI administration on notice that Lewis was continuing to have problems was his August absence from work and the doctor's certificate stating that he had "Acute Agitated Depression."
 
 
 36
 The incidents and testimony described above all indicate clearly that the responsible management of FPI was on notice that its remedial action was ineffective. Most of this evidence was ignored in the district court's opinion. When it did describe one incident, the district court did not mention that Mincey was aware of it. Thus, the evidence clearly indicates that the district court's finding that the responsible management of FPI did not know that the limited steps it took to remedy the problem were ineffective is clearly erroneous. We have a definite and firm conviction that both Mincey and Bogan knew or should have known that the remedial action was insufficient.
 
 
 37
 In conclusion we hold that the district court's finding that Lewis' employer was not on notice that the remedial steps it took were ineffective is clearly erroneous. Lewis has proven that adverse employment action was taken against him and has made out a prima facie case of age discrimination under the McDonnell-Douglas four-prong test. Therefore, the district court's decision is reversed, and the case is remanded to the district court for proceedings not inconsistent with this opinion.
 
 REVERSED and REMANDED.[12]
 
 
 [1]
 The district court stated the facts at some length, though with certain significant omissions highlighted below. While adding the omitted facts, our statement of the facts often borrows verbatim the language of the district court
 
 
 [2]
 Lewis would have been subject to mandatory retirement on his 55th birthday
 
 
 [3]
 The district court rejected Lewis' evidence of direct discrimination, and Lewis has not challenged that ruling on appeal
 
 
 [4]
 The standard for determining whether an employee has been constructively discharged has been established as follows:
 The general rule is that if the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer has encompassed a constructive discharge and is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee.
 Young v. Southwestern Savings & Loan Ass'n, 509 F.2d 140, 144 (5th Cir.1975).
 
 
 [5]
 Our disposition of this case makes it unnecessary to address Lewis' argument that we should overrule Henson, which of course a panel of this court could not do. Only the en banc court or the United States Supreme Court can overrule the decision of a panel of this court. See, e.g., Druid Hills Civil Ass'n, Inc. v. Federal Highway Administration, 772 F.2d 700, 716 n. 18 (11th Cir.1985)
 
 
 [6]
 Because of our disposition of this case on the basis of the actions and knowledge of Superintendent Mincey and Warden Bogan, we need not address the scope of Tidwell's actual or apparent authority or FPI's liability for Tidwell's actions. See Henson v. City of Dundee, 682 F.2d at 909-10. Also, because Mincey and Bogan clearly had actual or apparent authority to hire, fire, and discipline, our decision need not address the outer bounds of an employer's respondeat superior liability
 
 
 [7]
 It should be noted that the FPI administration in Washington also had a role in some FPI personnel actions at FCI. For example, the hiring of Baker was initiated by someone in Washington. Record on Appeal, vol. 8 at 85. In addition, the transfer of a woodcrafter foreman to another facility was a decision made in Washington. Id. at 83
 
 
 [8]
 In addition, Tidwell testified at trial, contrary to earlier testimony, that he was acting at the behest of Warden Bogan and Scott Graham, the FPI factories manager in Washington. If the court had believed Tidwell's trial version of the events, Lewis would have proven not only a prima facie case under the McDonnell-Douglas test but also a prima facie case of intentional discrimination. However, the district court found Tidwell's testimony "less than credible." Record on Appeal, vol. 2 at 440. Our analysis accepts this and other credibility choices of the district court
 
 
 [9]
 As noted above, there is evidence in the record that on July 29, 1982 Lewis asked Mincey to help him with an EEOC filing. While this evidence is uncontroverted, it appears only in the testimony of Lewis. If believed, this evidence would indicate that Mincey had another reason to be aware that Lewis was still seriously upset by discriminatory harassment
 Other factors, though less important than those described in the text, contribute to our conclusion that Mincey was aware of the continuing harassment. In light of the extensive harassment found by the district court, the small size of the work force, and the fact that Mincey shared a glass-enclosed office overlooking the work area with Tidwell, it is inconceivable that Mincey was not aware of some of the continuing harassment. In reaching its conclusion that FPI had no further notice that its remedial action was insufficient, the district court merely found that Mincey "upon receiving no further complaints from Lewis, ... reported to Bogan that the problem appeared resolved." Record on Appeal, vol. 2 at 439. As noted above, nowhere did the district court mention Mincey's knowledge of the specific incidents described above. Nor did the district court make any finding that Mincey was unaware of the other incidents of harassment which it found had occurred. It seems almost certain that Mincey, who not only shared the glass office with Tidwell but also made daily tours of the prison, had some awareness that Lewis' co-workers shunned him, that Lewis appeared haggard and nervous, that on occasions other than June 23 Tidwell reprimanded Lewis in front of inmates, that other employees knew of a continuing problem between Tidwell and Lewis, and that other employees believed that Patty Baker had been hired to replace Lewis.
 
 
 [10]
 FPI argues in its brief on appeal that Warden Bogan reprimanded Tidwell for his treatment of Lewis as detailed in Lewis' July memorandum. However, the record is clear that the August 12 reprimand concerned the false statement which Tidwell made to Associate Warden Clark rather than the continued harassment of Lewis. Record on Appeal, vol. 8 at 109-11 ("I made it clear to Mr. Tidwell that if he continued to behave in the ways in which he made false statements to superiors, that this could be very detrimental to him.")
 
 
 [11]
 Also it should be noted that Warden Bogan testified that if Lewis had "retired voluntarily I would not have been sorry to see him go." Id. at 116
 
 
 [12]
 In the light of our disposition of the merits of this case, 85-3070, we REVERSE the district court's award of costs to FPI, which is the subject of a separate appeal, 85-3353