**Karen L. ROSS, Plaintiff,**

v.

**The TWENTY–FOUR COLLECTION, INC., et al., Defendant.**

No. 85–3216–Civ.

United States District Court, S.D. Florida.

March 11, 1988.

Edward Nicklaus, Miami, Fla., for plaintiff.

Richard Lapidus, Miami, Fla., for defendant.

---

## FINAL ORDER, FINDINGS OF FACT, CONCLUSIONS OF LAW

MARCUS, District Judge.

THIS ACTION was brought by Plaintiff Karen Ross, against her former employer The Twenty–Four Collection, Inc. ("The Twenty-Four Collection"), and its President, Charles Goldstein, alleging a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (1982). Ross was employed by the Defendants as a buyer of "high fashion" European and American clothing, and alleges that she was the victim of repeated, "sexual harassment" by Mr. Goldstein, and that the consequent working conditions were so intimidating, oppressive, and unpleasant that she was compelled to resign. The facts developed at trial have satisfied this Court that Ms. Ross was indeed the victim of a pattern of sexual harassment, intimidation and abuse, and that this misconduct resulted in her forced resignation.

Plaintiff's Complaint was tried before the Court without a jury, and pursuant to Rule 52(a), Federal Rules of Civil Procedure, we make the following Findings of Fact and Conclusions of Law.

### I. FINDINGS OF FACT

1. The Plaintiff, Karen Ross, a resident of Dade County, Florida, was employed by the Defendant The Twenty–Four Collection as a buyer initially in 1977 and was terminated in December 1978. She began a second term of employment on November 15, 1982 and worked for The Twenty–Four Collection until her constructive discharge in or about April 1984. The allegations surrounding this lawsuit arise out of Ms. Ross' second period of employment.

2. The Twenty–Four Collection is an employer engaged in an industry affecting commerce within the meaning of §§ 701(b), (g) and (h), of Title VII; 42 U.S.C. §§ 2000e(b), (g), (h) (1982); and at all relevant times it has employed more than fifteen persons. The Defendant corporation has been involved in the retail sales of upper-scale women's clothing and related accessories and men's clothing in south Florida, with retail stores in Dade, Broward and Palm Beach Counties.

3. The Defendant Charles Goldstein has served as President and Chief Operating Officer of the Defendant corporation since its inception more than twelve years ago. Goldstein is also a director and majority shareholder of the company.

4. Prior to commencing her employment with the Defendant corporation, Plaintiff had extensive education, training and employment background in merchandising and buying in the fashion industry. The Plaintiff attended Pennsylvania State University where she majored in marketing. Among the relevant jobs she held are the following: from June 1979 to September 1983, Ross was employed by Saks Fifth Avenue in Phoenix and Pittsburgh as an Assistant Salon Manager, Department Manager for Swimwear, and Assistant Sportsdress Manager; from October 1973 until the end of

1975, Plaintiff was employed by Sakowitz in Scottsdale and then Houston, holding a position as buyer for all the European sportswear for Sakowitz stores; from March 1976 to May 1977, Ross was employed by Rhodes Southwest in Phoenix as a buyer of contemporary dresses and sportswear.

5. In or about June 1977, Plaintiff took a position with The Twenty–Four Collection as Buyer of European and American clothing. During her initial period of employment, Plaintiff had occasion to travel to various European "high fashion" cities, as well as various fashion centers in the United States buying merchandise. On some of these occasions, Plaintiff was accompanied by Defendant Charles Goldstein, and at least once, Ms. Ross consensually engaged in sexual relations with the Defendant. This initial period of employment was terminated in December 1978.

6. Prior to this initial period, Plaintiff signed an employment agreement with the Defendant corporation which contained a non-competition agreement. Upon her termination in December 1978, Plaintiff went to work as a buyer of American and European women's clothing for a competitor of the Twenty–Four Collection, Caché Stores in Miami, in violation of her non-competition agreement. The Defendant brought suit in the state courts to enforce this restrictive covenant. In *Twenty–Four Collection, Inc. v. Keller*, 389 So.2d 1062 (Fla. 3d DCA 1980), *review denied*, 419 So.2d 1048 (Fla.1982), the Third District Court of Appeal upheld the covenant and enjoined Plaintiff from working for a competitor, but ruled that the covenant could be restricted in time and place in the discretion of the trial court. Thereafter a trial court in the Eleventh Judicial Circuit limited the covenant to one year and to Dade, Broward and Palm Beach Counties. A final judgment enjoining Plaintiff from violating the non-competition agreement for a period of one year was entered on May 7, 1981.

7. Plaintiff left her employment with Caché stores sometime in April 1981.

8. At all times relevant, Plaintiff suffered from and received medical treatment for Crohn's disease, an ailment exacerbated by emotional distress. Defendant Goldstein was aware throughout Plaintiff's employment that she suffered from this illness.

9. In October 1982, Plaintiff again sought employment as a buyer of women's sportswear with The Twenty–Four Collection, writing a lengthy letter to Mr. Goldstein, in response to an advertisement.

10. Plaintiff was hired again by the Defendant as a buyer of European and American women's clothing on November 15, 1982, a position she held until her resignation in April 1984. Throughout this second period of employment, we believe Plaintiff was subjected to repeated sexual advancements, threats and harassment. We have found Plaintiff's testimony to be credible as to these serious charges, and that this misconduct created an intolerable work environment causing Plaintiff to resign in April 1984.

11. In January 1983, soon after the resumption of her employment with The Twenty–Four Collection, and while on a business trip, the Defendant Charles Goldstein told Ms. Ross that he found her extremely attractive and that he wanted her to spend the night with him. The Plaintiff, then married, refused, being fearful that Defendant's desire for a personal relationship would destroy her business relationship with The Twenty Four Collection. Later, in the office, the Defendant repeated those overtures and again was rebuffed.

12. Sometime in or about March of 1983, while on a business trip to Paris, the Defendant again asked Ms. Ross to spend the night with him. She refused.

13. On another occasion, Plaintiff discovered on her desk a sealed envelope addressed to her, marked "personal and confidential," and containing a newspaper article announcing a seminar concerning "extra-marital affairs without guilt" and $7.50 in cash.

14. Several times in the spring of 1983, the Defendant asked Ms. Ross to spend the weekend with him in New York City. Plaintiff again rejected these advances.

15. In August 1983, while attending a buying trip in New York City, the Defendant entered Plaintiff's hotel room at the Sherry–Netherland Hotel, wearing a bathrobe, and attempted to climb into Plaintiff's bed. Thereafter, the Defendant continued to make sexually explicit remarks to Ms. Ross, even though these advances were repeatedly rejected. On at least one occasion, the Defendant told Ms. Ross that if she left the employ of The Twenty–Four Collection, it would be the end of her career. Plaintiff's physical and mental health deteriorated markedly, and her treatment for Crohn's disease was exacerbated.

16. On a buying trip to Milan, Italy, the Defendant entered Plaintiff's hotel room and asked her to shower with him. On still another occasion, during a trip to New York sometime in January 1984, the Defendant, wearing a robe in a hotel room, attempted to massage the Plaintiff's neck and body and forced her to lie down with him on the bed. On a third occasion the Defendant gave the Plaintiff a pornographic magazine.

17. In early February 1984, the Defendant asked Ms. Ross to join him on a buying trip in Europe. When the Plaintiff told Goldstein that she did not want to accompany him, the Defendant told her that if she did not go she would be fired from her job. Suffering from severe anxiety Plaintiff refused to go, presented Defendant with a letter from her physician and took a 90–day leave of absence without pay. Plaintiff's health continued to deteriorate throughout the latter period of employment, in substantial measure, we think, because of Defendant's repeated misconduct. Plaintiff again met with Defendant in April of 1984 to talk about her future, and at that time, the Defendant tried to place his arms around her and kiss her on the mouth. Plaintiff left the meeting and terminated her employment with The Twenty–Four Collection.

18. During the period of Plaintiff's employment, from November 15, 1982 until her termination on or about April 11, 1984, pursuant to contract, Ms. Ross was to be paid $30,000 during the first year, and at a rate of $40,000 per year in the second year of employment. The amount of compensation was to rise to $45,000 in the third year and $50,000 in the fourth. Additionally, Plaintiff was entitled to one month's severance pay for the first year of employment and two-month's severance pay for the second year. According to Plaintiff, in the second year of her employment, Plaintiff exercised the option of receiving a salary of $35,000, with the balance of her remuneration in the form of a $200 per week clothing allowance. Therefore, at the time of her constructive discharge, Plaintiff contends that she was being compensated at the rate of $45,400 per year. Goldstein testified that during her second year of employment, Ross was paid at the rate of $40,000 per year. According to the Defendant, the compensation was divided between a straight salary rate of $34,800 per year, and a $100 per week clothing allowance. Further, Plaintiff received as part of her compensation $700 worth of trade publications per year. Plaintiff was paid her salary until February 1984.

19. Ms. Ross has not sought employment since the date she left The Twenty–Four Collection.

20. On August 14, 1984, the Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") of the United States under 42 U.S.C. § 2000e, *et seq.*, alleging discrimination because of her sex, female, and by being sexually harassed in violation of Title VII. On or about July 7, 1985, the EEOC issued a notice of Right to Sue to the Plaintiff.

## II.  CONCLUSIONS OF LAW

1. Plaintiff, Karen Ross, maintains that because of the sexual harassment by Goldstein she was forced to terminate her employment and was, in effect, constructively discharged. It is by now well established that Title VII prohibits sexual harassment in employment. *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *see also Henson v. City of Dundee,* 682 F.2d 897 (11th Cir. 1982); *Sapp v. City of Warner Robins,* 655

F.Supp. 1043 (M.D.Ga.1987). Accordingly, in order to establish her constructive discharge claim, she must establish two elements: first, that she suffered sexual harassment; and second, that the harassment created "working conditions [which] were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Wardwell v. School Board of Palm Beach County, Florida,* 786 F.2d 1554, 1557 (11th Cir.1986) (*citing Bourque v. Powell Electrical Manufacturing Co.,* 617 F.2d 61, 65 (5th Cir.1980); *Young v. Southwestern Savings & Loan Association,* 509 F.2d 140, 144 (5th Cir.1975)) (footnote omitted).

■ 2. To establish a sexual harassment claim, the Plaintiff must establish the existence of five conditions.

These elements are: (1) the employee belongs to a protected group; (2) the employee was subject to unwelcomed sexual harassment; (3) the harassment was based on sex; and (4) the harassment affected a "term, condition or privilege" of employment. Finally, if the harassment is alleged to have been conducted by a co-worker or supervisor, the plaintiff must prove respondeat superior.

*Sapp,* 655 F.Supp. at 1049 (*citing Henson,* 682 F.2d at 903–05). Here, we find that the Plaintiff has clearly met this burden.

The Plaintiff, as a woman, is a member of a protected group. The consideration of the other elements requires an analysis of exactly what conduct constitutes harassment. The Supreme Court has recently identified two distinct forms of sexual harassment. *"Quid pro quo* harassment" occurs when sexual favors are required in exchange for employment benefits. *Meritor Savings Bank, FSB,* 106 S.Ct. at 2405. "Hostile environment harassment" exists when

"[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature[,] ... has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment."

*Id.* (quoting 29 C.F.R. §§ 1604.11(a), 1064.-11(a)(3) (1985)).

During trial it was intimated that the Plaintiff suffered *quid pro quo* harassment. However, since we believe that the Plaintiff has fully stated a claim for hostile environment harassment we rest our decision principally on that theory. Ross was the victim of unwelcomed and explicit sexual advances on at least seven discernable occasions. Further, the Defendant subjected the Plaintiff to other conduct of a sexual nature, such as when he gave her a pornographic magazine, and left an article on her desk regarding a "seminar" on "extra-marital affairs without guilt." Clearly, this harassment was based on sex. But for the fact she was female, she would not have been singled out for such treatment. *Henson,* 682 F.2d at 903–04.

■ Sexual harassment is actionable if it is so "severe or pervasive [as] 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor Savings Bank, FSB,* 106 S.Ct. at 2406 (quoting *Henson,* 682 F.2d at 904). Examining the totality of the circumstances, *see id.* at 2407; *Henson,* 682 F.2d at 904, we are compelled to find that the harassment suffered by the Plaintiff was both severe and pervasive. The facts of this case reveal a pattern of conduct neither subtle nor oblique. Moreover, the Eleventh Circuit has established that an employee's psychological well-being is a condition of employment. *Phillips v. Smalley Maintenance Services, Inc.,* 711 F.2d 1524, 1529 (11th Cir.1983); *Henson,* 682 F.2d at 904; *Sapp,* 655 F.Supp. at 1049. The evidence has conclusively established that the harassment of the Plaintiff did affect her psychological well-being. Specifically, the testimony revealed that the Plaintiff's emotional distress exacerbated her symptoms of Crohn's disease. The effect of harassment was further evidenced when Ross was unable to board an airplane for a buying trip because she suffered an anxiety attack. Thereafter, she was required to take a leave of absence on the advice of her physician because of in-

creased stress and the exacerbation of her illness because of this anxiety.

■ This action has been brought against both The Twenty–Four Collection and Charles Goldstein. Employers are not "automatically liable for sexual harassment by their supervisors." *Meritor Saving Bank, FSB*, 106 S.Ct. at 2408. Instead, the Plaintiff "must show that the employer knew or should have known of the harassment in question and failed to take prompt remedial action." *Henson*, 682 F.2d at 905 (citations omitted); *see also Lewis v. Federal Prison Industries, Inc.*, 786 F.2d 1537, 1543 (11th Cir.1986); *Sapp*, 655 F.Supp. at 1049–50. Since Goldstein was both the harassing employer and the president and director and majority shareholder of the corporation, there can be no doubt that his actual knowledge of the conduct can be imputed to the corporate defendant.

■ 3. Having found that the Plaintiff suffered sexual harassment by the Defendants, we turn our consideration to whether this environment forced her to resign. The issue of constructive discharge is a question of fact. *Wardwell*, 786 F.2d at 1557 (*citing Buckley v. Hospital Corporation of America, Inc.*, 758 F.2d 1525, 1530–31 (11th Cir.1985)) (other citation omitted). In making this finding, a court is required to apply an objective standard. *Id.* (examine the reasonable person in Plaintiff's position); *see also Yates v. Avco Corp.*, 819 F.2d 630, 636–37 (6th Cir.1987). In order to find that Ross was constructively discharged, we are required to determine whether on this record a reasonable person would find that the numerous unwelcome sexual advances were so unpleasant as to compel resignation. Such a finding is both reasonable and fair. The conditions created by Goldstein made the Plaintiff's "working conditions so intolerable," *Young*, 509 F.2d at 144, that she had no choice but to resign.

4. "In awarding damages in a Title VII case, the district court must seek to place the injured party in the position ... she would have been in absent the discriminatory actions." *Walters v. City of Atlanta*, 803 F.3d 1135, 1145 (11th Cir.1986) (*citing*

*Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Nord v. United States Steel Corp.*, 758 F.2d 1462, 1470 (11th Cir.1985)). Back pay has consistently been awarded by courts, as of right, where the plaintiff has been terminated because of discrimination. Indeed the Supreme Court has stated that

given a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination.

*Albemarle Paper Co.*, 422 U.S. at 421, 95 S.Ct. at 2373 (footnote omitted); *see also Nord*, 758 F.2d at 1472; *Lewis v. Smith*, 731 F.2d 1535, 1538 (11th Cir.1984); *McCormick v. Attala County Board of Education*, 541 F.2d 1094, 1095 (5th Cir. 1976). Moreover, "back pay" has been held to include straight salary as well as "'[i]nterest, overtime, shift differentials, and fringe benefits....'" *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1562 (11th Cir.1986) (*quoting Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 263 (5th Cir.1978)), *cert. denied,* —— U.S. ——, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986).

Consonant with the important objective of making the injured party whole, a back pay award under Title VII should be limited to proven economic loss. *Darnell v. City of Jasper, Alabama*, 730 F.2d 653, 656 (11th Cir.1984); *Marks v. Prattco, Inc.*, 607 F.2d 1153, 1155–56 (5th Cir.1979). More particularly, the discriminatee has a duty to minimize damages "by being reasonably diligent in seeking employment substantially equivalent to the position ... lost." *Walters*, 803 F.2d at 1145. The statute declares in this regard:

Interim earning or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.

42 U.S.C. § 2000e–5(g) (1982).

5. Defendants contend that even if the Plaintiff was a victim of sex discrimination

in violation of Title VII, she would not be entitled to recover damages because she had not sought other employment after leaving The Twenty Four Collection. *See Miller v. Marsh*, 766 F.2d 490, 491–93 (11th Cir.1985). However, the circumstances surrounding her failure to pursue other employment are unique, and not easily applicable to prevailing standards.

■ We begin by observing again that Plaintiff had a previous tenure with The Twenty Four Collection. At that time, she had signed a two-year non-competition agreement with the Defendant. After she left their employ, the Plaintiff found other work in the industry. However, The Twenty Four Collection successfully sued to enforce the restrictive covenant. *See Twenty Four Collection, Inc., supra.*

When Ross became employed by the Defendant for the second time on November 15, 1982, she signed a virtually identical non-competition agreement. The only term that had been changed was that of duration. The parties created a sliding scale which based the effective duration of the restrictive covenant on her length of employment with the Defendant.[1] After she resigned from The Twenty–Four Collection, Ross believed that she was bound by the non-competition agreement, and therefore did not seek similar employment. Defendants contend that if in fact Plaintiff was constructively discharged due to acts of sexual harassment, then that conduct constituted a breach of the employment contract, and the Plaintiff was no longer bound by the restrictive covenant. *See Matter of Thomas*, 51 B.R. 653 (Bankr.M.D.Fla.1985); *Troup v. Heacock*, 367 So.2d 691 (Fla. 1st DCA 1979). In essence, under these facts Defendants claim that the Plaintiff was bound to either relitigate the validity of the non-competition agreement

or simply ignore it and seek employment elsewhere.

Under established caselaw, it is indisputable that Ms. Ross was not diligent in her search for new employment after she resigned from The Twenty Four Collection. The central question as to damages is whether that lack of diligence is excusable because of her reliance upon the non-competition agreement. The Eleventh Circuit Court of Appeals, in a case factually distinct from the one at bar, was presented with the issue of whether under a particular set of circumstances, the failure to mitigate may be excused. In *Walters*, 803 F.2d at 1145–46, the defendants were found to have discriminated against the plaintiff on the basis of race on four separate occasions in refusing to name him the Director of Cyclorama, in Atlanta. *Id.* at 1139–40. Since a child, the plaintiff had sought employment at Cyclorama, *id.*, at 1139, and when he was rebuffed he pursued his goal rather than seek alternative employment. *Id.* at 1145. The court found that the desire to work at a specific job, "is not a substitute for diligently seeking alternative employment." *Id. (citing Miller*, 766 F.2d at 492). Moreover, " '[t]he plaintiff must be available and willing to accept substantially equivalent employment elsewhere.' " *Id. (quoting Miller*, 766 F.2d at 492). If no other job in the plaintiff's field is suitable, the plaintiff "must seek employment in another field." *Id.*

In determining whether the failure to diligently seek to minimize damages is excusable here, we note initially that the Supreme Court has stated that while an "unemployed ... claimant need not go into another line of work, accept a demotion or take a demeaning position, he forfeits his right to backpay if he refuses a job substantially equivalent to the one ... denied." *Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219,

---

1. The employment contract stated *inter alia,*

   In the event of the termination, voluntarily or involuntarily, of the undersigned's employment with the EMPLOYER, for any reason, then for a period of two (2) years* from the date of said termination, the undersigned employee will not engage, in any capacity, directly or indirectly, in any business in Dade, Broward or Palm Beach Counties, Florida, similar to the kind or nature of business conducted by the EMPLOYER during the employment.

   A handwritten footnote contained the following:
   * Non competition agreement period not two (2) years until after 12 months from date.
   1–3 months = 6 months
   4–12 months = 1 year
   Thereafter = 2 years

232, 102 S.Ct. 3057, 3066, 73 L.Ed.2d 721 (1982) (footnotes omitted). Accordingly, Ross, immediately after her discharge, was not required to seek work in another field, or in lesser position in the fashion industry simply to mitigate her lost pay. Further, the criteria as cited in *Walters* is inapplicable to this case. First, Ross did not fail to seek alternative employment because she did not desire a different position. She believed that she was legally barred from accepting such employment. Second, Plaintiff was ready and willing to accept comparable employment if such an opportunity had been open to her. Finally, Plaintiff's problem was not merely that other employment in her field was not *suitable* to her, but simply unavailable. Requiring a diligent, though necessarily futile effort to mitigate under these circumstances would be counter to the teaching of *Ford Motor Co.,* and the thrust of *Walters.*

Other Eleventh Circuit precedent does not compel a different conclusion. In *Nord, supra,* the court found that the plaintiff was entitled to back pay for the period she had stopped looking for employment, and devoted her time to setting up her husband's practice as a psychologist. "Rather than continue [a] fruitless search she sought to establish secure future employment." *Nord,* 758 F.2d at 1471.

In *Miller, supra,* the plaintiff effectively "removed herself from the labor market by enrolling as a law student on a full-time basis." *Miller,* 766 F.2d at 492. The court found that she was not ready, willing and available to accept substantially similar employment. If the plaintiff had been awarded back pay for this period of unemployment, she would have received a double benefit, in that she would have been paid during a period in which she was preparing for future increased earnings. *Id.* (*citing Taylor v. Safeway Stores, Inc.,* 524 F.2d 263 (10th Cir.1975)). This scenario is distinguishable from *Nord,* because there the plaintiff's search was futile and there was no lost opportunity for present compensation.

In *Smith v. American Service Company of Atlanta, Inc.,* 796 F.2d 1430 (11th Cir.1986), the plaintiff had actively sought employment for a period of seven months after being discriminated against in a hiring decision by the Defendant. She then enrolled full-time in cosmetology school and worked part-time and continued to look for employment. The court found that it would be consistent with the decision in *Nord* to allow back pay for the period she was enrolled in school. *Id.* at 1432.

Plaintiff's predicament in this case must be considered analogous to those discriminatees who were allowed to recover back pay for the period after which their job search became fruitless. Because of the restrictive covenant and Defendants' apparent willingness and demonstrable ability to enforce it, it would have been futile, we believe, for Plaintiff to seek work in an industry in which she could not legally be employed. This period of inactivity can be likened to the period in *Nord* and *Smith,* wherein the plaintiff prepared for future earnings, while not turning down any alternate source of employment. Ross was required to wait until the non-competition term had expired before she could actually be compensated for work in her chosen field.

Moreover, we find it significant that the operation of the restrictive covenant was wholly within the control of the discriminating Defendants. To find that under these circumstances the Plaintiff had failed to mitigate her damages and therefore is ineligible to recover backpay, would effectively insulate this employer and similarly situated employers from the consequences of their illegal conduct. Further, such a finding would run counter to the policy considerations of Title VII in that the burden would be placed upon the discriminatee to either contest the terms of a non-competition agreement or endure discrimination rather than risk an adverse decision in the "contract" dispute. "Title VII's primary goal, of course, *is* to end discrimination; the victims of job discrimination want jobs, not lawsuits." *Ford Motor Co.,* 458 U.S. at 230, 102 S.Ct. at 3065 (emphasis in the original) (footnote omitted). The Defendants should not be permitted to benefit from the operation of the employment con-

tract, when their conduct clearly violated Ms. Ross' right to be free from sexual harassment. *See E.E.O.C. v. FLC & Brothers Rebel, Inc.,* 663 F.Supp. 864, 870 (W.D.Va.1987) (where plaintiff lost job because of sex discrimination, could not make car payments and therefore lost her car; defendant could not benefit by claiming that she failed to mitigate damages when she could not accept employment because she could not travel to it).

6. In calculating the amount of back pay owed by the defendant, the plaintiff has the burden of proving the amount of damage resulting from the employer's discriminatory acts. Once that showing has been made, the employer has the burden to prove that the plaintiff is not entitled to the full amount of back pay sought. *See Nord,* 758 F.2d at 1470. The employer's burden may be met by demonstrating the amount of the plaintiff's interim earnings, or that the plaintiff failed to exercise diligence in seeking employment. *Id. See generally, Sennello v. Reserve Life Insurance Co.,* 667 F.Supp. 1498, 1512–15 (S.D. Fla.1987).

In determining the appropriate back pay award, we must determine what Ms. Ross would have earned if she had not been constructively discharged by The Twenty–Four Collection. The Eleventh Circuit has stated that:

> Loss of pay shall be determined by deducting from a sum equal to that which [the employee] would normally have earned for each such quarter or portion thereof, [his] net earnings, if any, in other employment during that period.

*Darnell,* 730 F.2d at 657 (*quoting National Labor Relations Board v. Seven–Up Bottling Co.,* 344 U.S. 344, 345, 73 S.Ct. 287, 288, 97 L.Ed. 377 (1953) (*quoting F.W. Woolworth Co.,* 90 N.L.R.B. 289, 292–93 (1950))) (footnote omitted).

Plaintiff's term of employment ran from November 15, 1982 through April 11, 1984. Under the terms of the employment contract, Plaintiff was to be paid $30,000 for the first year; $40,000 for the second year; $45,000 for the third year; and $50,000 for the fourth year. When Plaintiff left the Defendant's employ, she had completed almost five months of her second year of the contract. Accordingly she received, or had waived by taking leave without pay, approximately $20,000 of her salary under the contract for the second year.

■ As stated by Florida's Fifth District Court of Appeal in *Twenty Four Collection, Inc.,* 389 So.2d at 1063, "[t]he only authority the court possesses over the terms of a non-competitive agreement is to determine, as the statue [Fla.Stat.Ann. § 542.12(2) (1977)] provides, the reasonableness of its time and area limitation." The trial court in that action subsequently determined that after Ross had worked for the Twenty Four Colleciton for approximately 18 months, the reasonable application of the non-competition clause would be for a period of one year. The Second Agreement attempts to specifically detail a reasonable non-competition duration term that is dependent upon the length of Plaintiff's employment. Under the new contract, the non-competition agreement would operate for a period of two years after twelve months of service. We specifically find that Plaintiff was entitled to rely upon the newly negotiated terms and that the operative period of the non-competition term was two years. Accordingly, Plaintiff is entitled to back pay for that entire period. There is some dispute as to the rate of Plaintiff's compensation at the time of her discharge. While Ross testified that she was being paid at the annual rate of $45,400, Goldstein stated that she was actually compensated at the rate of $40,000 per year as contained in the terms of the written contract. We therefore find it appropriate to base Plaintiff's backpay award upon the terms embodied in the written employment contract. The breakdown of the back pay award is:

| | | | |
|---|---|---|---|
| 7 months | @ $40,000/year | = | $23,333.33 |
| 1 year | @ $45,000/year | = | $45,000.00 |
| 5 months | @ $50,000/year | = | $20,833.33 |
| TOTAL 2 years | | = | $89,166.66 |

Further, under the terms of the contract, the Plaintiff was entitled to two months' severance pay. While the contract is not

clear on this subject,[2] both Ross and Goldstein testified that they understood the agreement to mean that she was to receive one month's severance pay if she was employed up to one year, and two month's severance pay if employed between one and two years. Since Plaintiff had worked for more than one, but less than two years, Ross is entitled to two month's severance pay based on her annual rate at the time of her discharge. Severance pay therefore amounts to $6,666.66. Further, Plaintiff had received as a fringe benefit, $700 worth of publications related to her employment. No evidence was adduced which bore upon Plaintiff's lost sick pay, health insurance, or other remuneration.

7. Under Title VII, 42 U.S.C. § 2000e–5(k), the Court may, in its discretion, allow the prevailing party to recover "a reasonable attorney's fee as part of the costs." The Defendants are liable to Ross for the costs incurred in this action, including a reasonable attorney's fee. Accordingly it is

ORDERED and ADJUDGED that Defendants, The Twenty–Four Collection, Inc., and Charles Goldstein are liable to Plaintiff in the amount of $97,233.32 [3] as well as reasonable costs and attorney fees. It is further

ORDERED and ADJUDGED that Plaintiff shall submit within ten (10) days affidavits pertaining to the fees and costs incurred in this matter. Defendants shall have ten (10) days thereafter in which to respond to any such affidavits.

---

2. The compensation and severance pay terms of the employment contract read:

| Compensation | (annual minimum) | |
|---|---|---|
| Year | Amount | Severance |
| 1 | 30 | 1 month |
| 2 | 40 | 2 " |
| 3 | 45 | |
| 4 | 50 | |

| | | |
|---|---|---|
| Back wages = | $89,166.66 |
| Severance pay = | 6,666.66 |
| Fringe benefits = | 1,400.00 |
| TOTAL | $97,233.32 |